IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

UNITED STATES OF AMERICA,       ) Case No. 17-03011-01-CR-S-RK
                                )
            Plaintiff,          ) Springfield, Missouri
                                ) February 6, 2018
v.                              )
                                )
FELIX FRANZ FORJAN,             )
                                )
            Defendant.          )
_____)

TRANSCRIPT OF HEARING ON MOTION TO SUPPRESS EVIDENCE
BEFORE THE HONORABLE DAVID P. RUSH
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:          Mr. Abram McGull II
                            Assistant United States Attorney
                            901 St. Louis St., Ste. 500
                            Springfield, MO  65806
                            (417) 831-4406

For the Defendant:          Mr. Adam D. Woody
                            2121 S. Eastgate Avenue
                            Springfield, MO  65804
                            (417) 720-4800

Court Audio Operator:       Ms. Karla Berziel

Transcribed by:             Rapid Transcript
                            Lissa C. Whittaker
                            1001 West 65th Street
                            Kansas City, MO  64113
                            (816) 914-3613

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1    (Court in Session at 9:00 a.m.)

2    THE COURT:  Calling in *United States vs. Felix Forjan*.

3  The defendant appears in person along with his attorney, Mr. Adam

4  Woody.  The United States appears by Assistant United States

5  Attorney, Mr. Abe McGull.  This matter is set this morning for a

6  suppression hearing as the defendant has filed a Motion to

7  Suppress Evidence; the Government has filed a response.  Mr.

8  Woody, are you ready to proceed?

9    MR. WOODY:  Yes, Your Honor.

10    THE COURT:  Mr. McGull, is the United States ready to

11  proceed?

12    MR. McGULL:  Yes, Your Honor.

13    THE COURT:  Is either party going to want to invoke the

14  rule?

15    MR. WOODY:  Yes, Your Honor.

16    THE COURT:  All right.  The rule will be invoked.  And

17  so both parties are responsible for having any of their witnesses

18  that are going to be called to testify this morning will have to

19  be outside of the courtroom while the other witnesses are

20  testifying.  Of course, that would exclude the case agent.  You

21  may call your first witness, Mr. McGull.

22    MR. McGULL:  Thank you, Your Honor.  The Government

23  calls Jason Copely.

24    UNIDENTIFIED MALE:  I'll get him.

25    MR. McGULL:  I told him to stay in.  Your Honor, also

1    while we're waiting for Mr. Copely, there was a case that came on

2    December 26th that I wanted to offer to the Court.  I think it

3    illuminates sort of the facts in this case and the law -- current

4    law in the Eighth Circuit.

5              THE COURT:  All right.  Thank you.

6              JASON COPLEY, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8    BY MR. McGULL:

9    Q.  Could you state your name for the record, please?

10   A.  Jason Copley.

11   Q.  And where are you employed, sir?

12   A.  I'm employed by the Springfield Police Department.

13   Q.  How long have you been with the Springfield Police

14   Department?

15   A.  I've been employed by Springfield PD for over ten years.

16   Q.  And you have any other law enforcement experience?

17   A.  All of my experience with the Springfield Police Department

18   is law enforcement experience.  I've also been in the National

19   Guard for 14 years, where I've worked various assignments and as

20   a military police officer and CID, which is criminal

21   investigations and intelligence.

22   Q.  Okay.  Now, what are your duties with the Springfield Police

23   Department?

24   A.  I'm assigned to the Narcotics Enforcement Team of the Special

25   Investigations Section.

1  Q.  And what is you do specifically with the Narcotics Team?

2  A.  Our focus is on long-term narcotics investigations.  We

3  conduct these investigations through surveillance and cultivating

4  informants.

5  Q.  And how many, I guess, drug interdiction cases or drug

6  surveillance cases have you done?

7  A.  Well, as a member of the Narcotics Enforcement Team, we're

8  required to follow up on all patrol drug cases, which we complete

9  I would say anywhere from 50 to 100 each year.  On top of that,

10  we're also responsible for cultivating our own drug cases, and

11  they vary anywhere from 10 to 20 long-term cases a year, if I had

12  to guess.

13  Q.  And when you say long-term cases, tell me about that.  What

14  do you mean?

15  A.  When I say long-term cases, I mean cases that we're trying to

16  develop information on conspiracies from the lower lying user to

17  the suppliers locally and within the nation.

18  Q.  Now, as part of your duties with the Drug Enforcement, do you

19  develop relationships with confidential informants?

20  A.  Yes.

21  Q.  What is a confidential informant?

22  A.  Basically a confidential informant is somebody that we task

23  to collect intelligence or provide intelligence to us regarding

24  the cases that we're working.

25  Q.  Okay.  Is that essential in drug cases?

1  A.  Yes, could be.

2  Q.  All right.  Now, I want to draw your attention to December 20

3  of 2016.  Were you employed on that particular day?

4  A.  Yes.

5  Q.  And on that particular day, did you -- were out as part of

6  your duties investigating a resident in the area of 569 Farrow

7  Road?

8  A.  Yes.

9  Q.  Why were you at that location?

10 A.  That resident of the address is currently part of multiple

11 ongoing investigations into the conspiracy to distribute

12 methamphetamine.  Prior to this date, I had collected information

13 through an informant and surveillance that led me to believe that

14 the target at that address is distributing large amounts of

15 methamphetamine.

16 Q.  Now, can you tell the Court what would draw your attention to

17 or make that assumption that this house was involved in the

18 distribution of methamphetamine?

19 A.  Well, essentially in this case, I was following up on a

20 different investigation that I identified that the target that

21 lives at the Nixa address, 569 Farrow, that's still involved in

22 ongoing investigation, was showing up in Springfield at a known

23 methamphetamine dealer's location, which we identified through

24 surveillance.  A confidential informant later corroborated that

25 that subject that was showing up in Springfield, the resident

1  from Nixa, was the one supplying that resident in Springfield

2  with pound level methamphetamine.

3  Q.  Okay.  All right.  Now, what got you from Springfield to the

4  Nixa location, 569 Farrow Road?

5  A.  The resident from Nixa was dealing methamphetamine in

6  Springfield.  So, we were brought out to Nixa -- or that brought

7  us out to Nixa to conduct surveillance on that address to

8  determine whether -- to try to determine whether he was

9  distributing the methamphetamine.

10 Q.  You're talking about the 569 Farrow Road?

11 A.  That's correct, the resident at that address.

12 Q.  Now, you say you conducted surveillance on this residence on

13 December 20th?

14 A.  Yes.

15 Q.  Did you do any surveillance on that residence prior to

16 December 20?

17 A.  Yes.

18 Q.  Can you tell us what were some of the things you observed

19 when you were doing --

20 A.  During surveillance I did note that two of my targets, both

21 of them from different cases, were at that address on different

22 occasions.  I also noted that there were, during certain periods,

23 there was a high volume of traffic at the address, which, based

24 on my training and experience, is indicative of narcotics

25 distribution.

1  Q.  Now, you said a high volume of traffic.  What are you talking

2  about?  Explain to the Court, please.

3  A.  A high volume of traffic to me is something that you would

4  see maybe at a business or somewhere that is conducting business

5  where you're going to have customers showing up, versus a

6  residential address where you may have a few visitors given the

7  day.

8  Q.  Now, is there anything distinguishable about these visits

9  from surveillance?

10  A.  Typically depending on the transaction from these drug

11  houses, the visits are typically short, anywhere from minutes to

12  within an hour.

13  Q.  Did you observe that on December 20 of 2016, at 569 Farrow

14  Road?

15  A.  Yes, there were multiple vehicles that had arrived at that

16  address.

17  Q.  And what is it you particularly do on that day at around, I

18  want to say about 6 -- I mean about 4:00?

19  A.  Around 1600 hours, we did, myself and two other detectives

20  set up on the address to conduct surveillance.  During

21  surveillance, we did identify that multiple vehicles did show up.

22  We attempted to conduct surveillance and follow one of them away,

23  which I believe was operating a vehicle as if maybe he knew we

24  were conducting surveillance on them.  And we later returned to

25  the address and identified another vehicle that had showed up,

1  another -- yeah, another vehicle that had showed up at the

2  address.

3  Q.  And so, is it your testimony that the confidential informant

4  indicated to you that this particular resident was involved in

5  drug trafficking?

6  A.  Yes, the confidential informant did, prior to this, did

7  inform us that the target at the Nixa address was responsible for

8  supplying a target in Springfield with pound level

9  methamphetamine.

10  Q.  Okay.  Now, is this confidential informant, is it someone you

11  have dealt with before or had provided accurate information?

12  A.  This informant had provided accurate information.  Prior to

13  that we had corroborated through ongoing investigations.

14  Q.  So, around 1630 or 4:30 in the afternoon, did you observe a

15  white Ford truck at that residence?

16  A.  Yes, and that is the one that we attempted to follow away

17  from the location.

18  Q.  Okay.

19  A.  Excuse me.  The first one we followed away was a white

20  Lincoln Mark.  The second truck was a white flatbed pickup.  So,

21  there are two white trucks that we identified that day.

22  Q.  Okay.  Now, can you tell me what drew your attention to those

23  particular vehicles?

24  A.  After we had followed the white Lincoln Mark away and

25  returned, there was a motorcycle that had arrived at the address

1   as well as the while flatbed pickup.  The occupants of the

2   vehicles -- or the vehicles had parked just east of the 569

3   Farrow address and had walked west -- or walked east to the

4   trailer.  The subject in the white flatbed truck had exited, left

5   the lights on the truck, went inside the trailer and had left the

6   lights on the truck, which, in my mind, were either accidentally

7   left on or the truck possibly remained running, indicating that

8   they were not going to stay long.

9   Q.  Does that -- would your experience and knowledge in drug

10  interdiction, does that tell you anything?

11  A.  Based on a few vehicles that showed up and were leaving in a

12  short amount of time, I believed that drug distribution was

13  taking place at that time.

14  Q.  I'm handing you what's been marked for identification

15  purposes as Government Exhibit #1 and ask you to take a look at

16  that item and tell me if you recognize it?

17  A.  Yes.

18  Q.  What is it?

19  A.  This is the vehicle that had parked at the 569 Farrow address

20  that we had conducted surveillance on and contacted the deputy to

21  conduct a traffic stop on.

22  Q.  Is that a true and accurate depiction of that flatbed truck

23  that you saw on December 20th of 2016?

24  A.  Yes.

25          MR. McGULL:  At this time, Your Honor, I would move to

1   admit Government's Exhibit #1.

2           THE COURT:  Any objection, Mr. Woody?

3           MR. McGULL:  That's the flatbed truck.

4                   (Off Record Talking)

5           MR. WOODY:  Yeah.  No objection.

6           THE COURT:  All right.  Government's Exhibit #1 will be

7   admitted into evidence for the limited purpose of this hearing

8   only without objection.

9                   (Off Record Talking)

10  BY MR. McGULL:

11  Q.  I've just handed you another document that's a labeled

12  Exhibit #2, Government Exhibit #2.  Do you recognize that

13  particular item?

14  A.  Yes, it's the same vehicle that we conducted surveillance on

15  leaving the 569 Farrow address that Deputy Hook had conducted the

16  traffic stop on.

17  Q.  Now, is that particular picture a true and accurate depiction

18  of that vehicle on December 20th, 2016?

19  A.  Yes.

20  Q.  And it's a little bit different than the first exhibit which

21  is now being published on the screen there.  Do you see it?

22  A.  Yes.

23  Q.  What is it -- well, how is it different than the second --

24  first picture, Exhibit #1?

25  A.  It appears to be taken from a different angle.

1  Q.  And it shows the color of the truck?

2  A.  Yes.

3         MR. McGULL:  At this time, Your Honor, I would move to

4  admit Government Exhibit #2.

5         THE COURT:  Any objection?

6         MR. WOODY:  No objection.

7         THE COURT:  Government's Exhibit #2 will be admitted

8  into evidence for the limited purpose of this hearing only

9  without objection.

10 BY MR. McGULL:

11 Q.  Now, what type of truck is that?

12 A.  It's a Ford flatbed pickup truck, crew cab.

13 Q.  And that's the vehicle that you radioed -- did you radio

14 anyone about that vehicle?

15 A.  No, I didn't radio it.  I was put in contact with Deputy

16 Hook.  I contacted him by cell phone prior to this vehicle

17 leaving, and I notified him that we were doing surveillance in

18 the area.  Once this vehicle did leave, I did call him again on

19 his cell phone and say, hey, we have this vehicle leaving and

20 conducted surveillance on it until he was able to conduct that

21 traffic stop.  Now, my initial contact with Deputy Hook basically

22 said that we were conducting surveillance in the area and we had

23 -- I believed that they were distributing methamphetamine.

24 Q.  Did you tell him to stop this vehicle based upon your

25 experience and knowledge as a drug interdiction officer?

1  A.  Yes.

2  Q.  What information did you give to Deputy Hook other -- did you

3  give a description of the vehicle?

4  A.  I gave him the description of the vehicle and the direction

5  of travel until he was able to get a visual on the vehicle where

6  he had got behind the vehicle and conducted the traffic stop.

7  Q.  Did you have any other communication with Deputy Hook after

8  that?

9  A.  After he conducted the traffic stop, he did contact me and

10 told me that he located what he believed was a large amount of

11 methamphetamine.

12 Q.  But you never went to the scene or anything?

13 A.  That's correct.

14 Q.  Okay.  Did you continue to do surveillance on that particular

15 residence?

16 A.  Yes.

17 Q.  On that particular night?

18 A.  On that particular night we conducted surveillance and

19 followed one vehicle away after this vehicle was stopped.  We

20 followed it almost up to Bolivar and had the Highway Patrol stop

21 that vehicle for us, which yielded negative results of any

22 controlled substances.

23 Q.  Now, at this point, were -- you had knowledge that this

24 particular house was either distributing or receiving narcotics

25 or both?

A.   At this point, like I said, I had the information from the

confidential informant that this subject had been the supplier of

another subject in Springfield for pound level methamphetamine.

I also had conducted surveillance on this location, identified

the amount of traffic that was arriving and departing, as well as

multiple drug targets that I had either information on or had

located drugs on in the past were present at that address during

surveillance prior to this.

Q.   Okay.  Now, when you say a place is supplying narcotics or

distributing narcotics from a location, do they also have to

receive narcotics themselves?  In other words, they have to have

a supplier as well, is that correct?

A.   That's correct.

Q.   Okay.

A.   That's correct.

Q.   So, you had no knowledge of when this particular resident was

re-upping?  Is that -- what's that term?

A.   There was no knowledge that this particular residence had any

controlled substances at that time.  It was merely surveillance

in the beginning, until we identified that there were multiple

vehicles that arrived and were departing in that brief period of

time.

         MR. McGULL:  That's all the questions I have of this

witness at this time.

         THE COURT:  Cross-examination?

1    MR. WOODY:  Thank you, Your Honor.

2                   CROSS-EXAMINATION

3    BY MR. WOODY:

4    Q.  Morning, sir.

5    A.  Good morning.

6    Q.  You had indicated previously that you had not only surveilled

7    this residence December the 20th, that you had done so before

8    then also?

9    A.  That's correct.

10   Q.  When would that have been?

11   A.  Prior to the six months prior to this date and following.

12   Like I said, this target is still -- he is still a target of an

13   ongoing investigation.

14   Q.  So, you had then -- you said you had been surveilling this

15   residence for six months?

16   A.  On and off for a period of probably six months.

17   Q.  How many times had you personally surveilled that or had

18   other agents surveil that particular residence?

19   A.  I would say between five and ten times.

20   Q.  And December 20th, I guess, culminated in this case, but you

21   said that that house currently is still under surveillance, it

22   sounds like?

23   A.  That's correct.

24   Q.  Previous to December the 20th, how many vehicles had you

25   requested to be stopped coming from that residence?

A. I don't recall that I had requested any to be stopped

specifically.

Q. So, this was the first night then that you had actively

requested other officers or other agencies to stop vehicles?

A. I don't believe we ever had any stopped. I believe there

were one or two times where I attempted to where there just

wasn't an officer in the area that could conduct the stop. And

unfortunately, that happens to us during our surveillance.

Q. Because you stated in this particular surveillance date that

you began following a Lincoln Mark --

A. Yes.

Q. -- earlier in the evening, --

A. Right.

Q. -- correct?

A. Yes.

Q. And you stated that that vehicle seemed like they knew that

you were following them.

A. That's correct.

Q. Which means what? They just kind of drive in circles?

A. This one didn't specifically. I mean, there are tactics that

are used when somebody believes that they are being surveilled or

that they always use if they are distributing narcotics because

they're basically in the habit of trying to ensure that nobody is

following them. But that particular vehicle did make me feel --

the actions of that driver made me feel like they possibly were

1  keen to our surveillance.

2  Q.  But you never requested anybody to stop that vehicle?

3  A.  Yes, I did.  And the first attempt was a Nixa.  The vehicle

4  made it to Springfield city limits.  Prior to that vehicle making

5  it to Springfield or while it was traveling into Springfield, I

6  contacted a Springfield officer who was unable to get there in

7  time to stop it before it stopped and pulled into a parking lot.

8  Q.  So nobody stopped that vehicle?

9  A.  That's correct.  It stopped and the driver had exited, and I

10  felt like it was watching us at that time.

11  Q.  But in regards though to this white flatbed, you contacted

12  Deputy Hook, is that correct?

13  A.  That's correct.

14  Q.  And you asked Deputy Hook to stop the vehicle?

15  A.  Yes.

16  Q.  Because it had left that residence?

17  A.  Because it had left that residence and because of my belief

18  that they were distributing narcotics.

19  Q.  In that residence?

20  A.  From that residence, yes.

21  Q.  The owner or occupant of that home you believed was selling

22  methamphetamine --

23  A.  Yes.

24  Q.  -- or distributing methamphetamine?

25  A.  Yes.

1  Q.  As the driver of the white flatbed left, you didn't observe

2  anything wrong with the vehicle?

3  A.  I didn't observe anything wrong with the vehicle from my

4  perspective, no.

5  Q.  You didn't observe it commit any traffic violations?

6  A.  No, I don't believe so.

7  Q.  So, other than it leaving this house, you had no -- no other

8  reason to stop the vehicle?

9  A.  There was my belief that they were distributing

10  methamphetamine from the house.  That vehicle had arrived and

11  departed within a short amount of time.  With it leaving its

12  lights on, it indicated that it probably was -- it had either

13  left them on on accident or intended to leave within a fairly

14  short amount of time.

15  Q.  So, other than it leaving this house, you had no other reason

16  to stop the vehicle?

17  A.  Correct, and the information, correct, yes, sir.

18  Q.  And you said that you observed the driver of the white truck

19  exit that vehicle and walk west to the home?

20  A.  Well, he walked east to the trailer, yes.

21  Q.  East to the trailer?

22  A.  Yes.

23  Q.  So, he parked west of the trailer?

24  A.  That's correct.

25  Q.  And walked east?

1  A.  That's correct.

2  Q.  Okay.  And you didn't recognize that driver at that time?

3  A.  That's correct.

4  Q.  You didn't know who that was?

5  A.  That's correct.

6  Q.  So, any of the intel that you had, anything that you received

7  from the confidential informant or any other officers, that

8  wasn't the name Felix Forjan?

9  A.  That's correct.

10  Q.  It was whoever occupied that house?

11  A.  Yes.

12  Q.  And you stated that you believed the confidential informant

13  had notified you that the occupant of that home there in Nixa, at

14  569 -- is it Ferrell?

15  A.  Farrow.

16  Q.  Farrow, F-A-R-R-O-W.

17  A.  That's correct.

18  Q.  The occupant of that house was going to Springfield and

19  providing methamphetamine to a target in Springfield?

20  A.  Not specifically that he was just going to Springfield but

21  that he was supplying that target in Springfield with

22  methamphetamine.

23  Q.  That's what the confidential informant told you?

24  A.  Yes.

25  Q.  That he was going to Springfield, at least to that one person

1  and supplying them?

2  A.  No, I -- I saw that person from the Nixa address in

3  Springfield at the Springfield target's address.  The

4  confidential informant informed us that that person was supplying

5  the Springfield target.

6  Q.  So, you saw the person in Nixa there in Springfield and the

7  CI was there?

8  A.  Repeat that, please.

9  Q.  You saw the Nixa target in Springfield at the Springfield

10  target's address, and the CI was involved in that?

11  A.  Not on that specific occasion, but I have observed the Nixa

12  target in Springfield at the Springfield target's address as well

13  as the Springfield target at the Nixa address.

14  Q.  Had the CI told you anything about other than the Nixa target

15  supplying the Springfield target in Springfield, had the CI told

16  you anything else about the Nixa target supplying from the home

17  in Nixa?

18  A.  The confidential informant stated that that person lived in

19  Nixa and was supplying our target.

20  Q.  In Springfield?

21  A.  Supplying the Springfield target, correct.

22  Q.  The driver of the white vehicle was not the Springfield

23  target, correct?

24  A.  That's correct.

25  Q.  Did the CI -- did this CI that you're talking about tell you

1  anything else about the Nixa target supplying methamphetamine to
2  anyone else?
3  A.  I don't believe so.
4  Q.  Just the one Springfield target?
5  A.  I believe so.
6  Q.  Who was not Felix Forjan?
7  A.  Correct.
8  Q.  Now, when you saw the driver of the white Ford flatbed, you
9  can't identify him, is that right?
10 A.  That's correct.
11 Q.  You never saw him carrying anything to or from the home?
12 A.  I don't recall.  I don't think so.
13 Q.  And you said that it was a trailer?  It's a trailer house, is
14 that what it is?
15 A.  Yes.
16 Q.  Okay.  So, a mobile home?
17 A.  Yes.
18 Q.  Is it in the Nixa city limits?
19 A.  I don't know.  I don't know if it is or not.
20 Q.  Which portion of Nixa is it in?
21 A.  It would be in the northeast area of Nixa, but I don't know
22 that it is specifically inside the city limits or if it is in
23 Christian County specifically.
24 Q.  You don't know whether it's in Christian County?
25 A.  It's in Christian County.

1  Q.  Oh.

2  A.  I don't know if it's in Nixa city limits.

3  Q.  And obviously when the driver of the white vehicle entered

4  the home, you never clearly saw anything exchange hands?

5  A.  That's correct.

6  Q.  You never saw who the driver spoke to there?

7  A.  That's correct.

8  Q.  And there were other vehicles there at the time?

9  A.  That's correct.

10  Q.  And as this white vehicle left the residence, did you attempt

11  to follow it at that point?

12  A.  Yes.

13  Q.  How far did you follow it?

14  A.  I would say probably about a half mile to a mile, prior to

15  Deputy Hook being able to see it and getting behind it.

16  Q.  And you observed no traffic violations?

17  A.  That's correct.

18  Q.  So, again, other than even following the vehicle for half a

19  mile or a mile, other than it leaving this residence, you had no

20  independent basis to request it being stopped?

21  A.  I believe that's correct.

22  Q.  And when you contacted Detective -- I'm sorry -- Deputy Hook,

23  did you ask him simply to make a stop?

24  A.  I told him the prior information, and I asked him to conduct

25  a traffic stop.  I informed him to try to keep it as random as

1  possible because we do not like to -- we do not like to inform

2  them that they are a part of a drug investigation to be able to

3  secure the ongoing progress of the case.  So I asked him to keep

4  it as random as he could but to conduct the traffic stop, and

5  then I believed that the residents had been distributing illegal

6  narcotics.

7  Q.  So, you asked him to make a stop?

8  A.  I asked him to make that stop.

9  Q.  And that was by cell phone?

10  A.  That's correct.

11  Q.  And had you used Deputy Hook before in this or other

12  investigations to make stops?

13  A.  No.  I think we were going to attempt to stop a motorcycle

14  prior to this, but I realized the potential of him not stopping

15  due to being on a motorcycle and possibly having controlled

16  substances was very low.  So, I determined not to have him stop

17  that vehicle, and that was the only time I think I'd used him

18  prior to that specific stop on the same day.

19  Q.  But even in prior days, you've used him?

20  A.  I don't believe I ever had any prior contact with Deputy

21  Hook.

22  Q.  But you had his cell phone number?

23  A.  Yes.  Which I had received from DEA TFO Brett Leslie.

24  Q.  So, that night you contacted Brett Leslie.  He gave you

25  Hook's cell --

1  A.  That afternoon.

2  Q.  That afternoon?

3  A.  Yes.  Yes, sir.

4  Q.  What was the purpose of receiving his cell phone number?

5  A.  The purpose was to have a patrol contact that could conduct a

6  traffic stop on vehicles leaving that address that was suspected

7  of distributing narcotics.

8  Q.  But you got it that afternoon?

9  A.  That's correct.

10  Q.  When did you start surveilling this residence that day?

11  A.  I want to say it was between 1500 and 1600.

12  Q.  What, 3:00 p.m.?

13  A.  Yes.

14  Q.  Sometime between 3:00 and, you said -- what time did you say?

15  A.  3:00 and 4:00 p.m.

16  Q.  Sometime between 3:00 and 4:00 p.m. is when you started

17  surveilling the home?

18  A.  Around that time, yes, sir.

19  Q.  And you had gotten Deputy Hook's phone number prior to that?

20  A.  It was around that time.

21  Q.  So, the purpose of getting Deputy Hook's phone number was,

22  hey, I'm going to start surveilling this house, I need this phone

23  number in case someone leaves?

24  A.  Yes, essentially.

25  Q.  You stated that you and two other detectives were conducting

1  the surveillance.  Were you in one vehicle or multiple?

2  A.  Multiple vehicles.

3  Q.  And you said when the Lincoln Mark -- did you say it was the

4  Lincoln Mark that had been stopped or a different vehicle had

5  been stopped and there was no narcotics there?

6  A.  No other vehicle had been stopped.  There was a -- there was

7  a vehicle that was stopped following the stop of Mr. Forjan that

8  there were no controlled substances located on.

9  Q.  And you had nothing to do with the actual stop or search?

10 A.  That's correct, sir.

11 Q.  And do you know or had you used Officer Wilson from Ozark

12 before?

13 A.  No.

14 Q.  And prior to December the 20th, you weren't familiar with the

15 name Felix Forjan?

16 A.  That's correct.

17 Q.  And you had never seen this white flatbed before?

18 A.  That's correct.

19        MR. WOODY:  I don't believe I have any other questions

20 right now, Judge.

21        THE COURT:  I just have two quick questions before

22 redirect.  Officer, the vehicle that was depicted in Government's

23 Exhibit #1 on December 20th at the residence, approximately how

24 long did it stay at the residence that day?

25        THE WITNESS:  I believe it was there for approximately

1  45 minutes to maybe an hour.

2          THE COURT:  And then I know you've testified about a CI

3  that had provided information about both the residence in Nixa

4  and about maybe even the target in Springfield, has that CI been

5  someone that you've used previously and have they been proven to

6  be reliable and have you corroborated information that they

7  provided?

8          THE WITNESS:  The information that they have provided

9  prior to this was corroborated through ongoing investigations.

10  Obviously, this information was corroborated during this

11  circumstance.  However, that CI has not specifically at that time

12  conducted any purchases *per se* for our agency.

13          THE COURT:  Mr. McGull, any redirect?

14          MR. McGULL:  Yes, I have a few, Your Honor.

15                    REDIRECT EXAMINATION

16  BY MR. McGULL:

17  Q.  You were asked about, by defense attorney, about surveillance

18  of the location at 569 Farrow Road.  How far were you from that

19  location when you were conducting surveillance on that day?

20  A.  I was probably about 50 yards away from the location.

21  Q.  Okay.  And being 50 yards away, could you tell whether

22  persons were carrying things in the house or taking things out of

23  the house?

24  A.  I believe at certain points maybe, but I think at this point

25  the light was starting to get low as well as my position did not

1  allow me to openly -- openly keep my head up to where I could

2  conduct 100 percent visual without drawing attention, which I was

3  doing in this case.

4  Q.  And that's all -- the whole purpose behind surveillance is

5  not to draw attention to yourself?

6  A.  That's correct.

7  Q.  So, you were also asked about, by defense attorney, that you

8  had no other reason to stop this vehicle when it left the house.

9  That's not quite true, is it?

10  A.  I didn't have probable cause to -- I didn't have independent

11  probable cause of a traffic violation.  I had the circumstances

12  of the traffic at the location and my belief that controlled

13  substances were probably in that vehicle based on the amount of

14  time he had been stopped there and the prior information at the

15  address.

16  Q.  So, you had probable cause to believe that this, either the

17  vehicle that was leaving was either carrying contraband or just,

18  delivering contraband or just received contraband?

19  A.  Yes.

20  Q.  Okay.  And that's the whole reason why you asked the other

21  officer to stop him?

22  A.  That's correct.

23  Q.  To stop the truck, that is?

24  A.  Correct.

25  Q.  Now, your belief was based upon your experience and knowledge

1  as a drug officer of ten years?

2  A.  I've been a narcotics detective for three years.  Prior to

3  that, I was in a community policing section where I focused

4  heavily on narcotics, and then prior to that I was a patrol

5  officer, four to five years of experience within narcotics and

6  conducting drug investigations.

7  Q.  And you also had information from the confidential informant

8  that said that drugs were being distributed out of that house?

9  A.  Yes, the information from the confidential informant did play

10  into the reason for the traffic stop on Mr. Forjan.

11  Q.  Okay.  Now, you say he stayed there for about 45 to 60

12  minutes?

13  A.  Yes.

14  Q.  Does that tell you anything as a narcotics officer,

15  experienced narcotics officer?

16  A.  It does tell me that it's not as -- it's not as short as some

17  of the deals that we do see, which are usually within minutes.

18  Based on my training and experience, I know that the more weight

19  that is being conducted or exchanged within a transaction or the

20  more money that is being exchanged, the longer it takes for the

21  transaction to take place due to weighing the controlled

22  substances out or counting the money to ensure that it's there,

23  if there is such a transaction.

24  Q.  And at this point, when you saw the white truck approach the

25  target home, that is, the 569 Farrow Road residence, you couldn't

1  tell if he was the supplier of methamphetamine or he was actually

2  someone who was picking up?

3  A.  That's correct.

4  Q.  All right.

5          MR. McGULL:  That's all the questions I have.

6          THE COURT:  Any recross?

7          MR. WOODY:  Yes, Your Honor.

8                  RECROSS EXAMINATION

9  BY MR. WOODY:

10 Q.  I just want to get straight what this CI had told you.

11 Because when I had talked to you on cross-examination, you had

12 said the CI told you that the resident of the Nixa house was

13 known to distribute to a target in Springfield at the Springfield

14 house?

15 A.  The CI did not say specifically that he distributes at the

16 Springfield house, but that he is the supplier of the target at

17 the Springfield house.

18 Q.  Well, the CI also never told you, according to what we've

19 heard before, the CI also never told you that the target in Nixa

20 was distributing out of the house in Nixa?

21 A.  That's correct.

22 Q.  Okay.  And you said that typically the more weight or money

23 that's being exchanged, the longer it takes.  You never observed

24 any transaction?

25 A.  That's correct.

Q.  And you never -- the person who walked out of the white

vehicle walking to the residence, you didn't see him carrying

anything?

A.  I don't believe so.

Q.  And you didn't see him carrying anything back?

A.  That's correct.

        MR. WOODY:  I don't think I have anything further.

        THE COURT:  All right.  May the witness be excused?

        MR. McGULL:  Yes, sir.

        THE COURT:  All right.  Thank you, officer.  You may be

excused.

        MR. McGULL:  The Government calls Deputy Jeff Hook, Your

Honor.

        JEFFREY HOOK, GOVERNMENT'S WITNESS, SWORN

                    DIRECT EXAMINATION

BY MR. McGULL:

Q.  Sir, could you state your name for the record, please?

A.  Jeffrey Hook.

Q.  And where are you employed, sir?

A.  At the Christian County Sheriff's Office.

Q.  And how long have you been at the Christian County Sheriff's

Office?

A.  A little over two years.

Q.  Okay.  And what are your duties there?

A.  I'm a patrol deputy.

1  Q.  And what does that consist of as a patrol deputy?

2  A.  Answering calls for service, enforcing traffic statutes and

3  investigating crimes, things of that nature.

4  Q.  Okay.  Now, were you working for the Christian County

5  Sheriff's Department on December 20th of 2016?

6  A.  Yes, I was.

7  Q.  And I want to draw your attention specifically to around 6:00

8  in the evening on that particular date.  Did you come into

9  contact with a Felix Forjan?

10 A.  Yes, I did.

11 Q.  And that person you came into contact, is he in the courtroom

12 today?

13 A.  He's sitting at the table over there, yes, sir.

14 Q.  Thank you.

15        MR. McGULL:  Let the record reflect that he's identified

16 the defendant.

17        THE COURT:  Can you describe what he's wearing?

18        THE WITNESS:  He's wearing what looks to be a Greene

19 County Detention Facility outfit, long grayish hair.

20        THE COURT:  The record will reflect that the witness has

21 identified the defendant, Felix Forjan.

22 BY MR. McGULL:

23 Q.  And specifically, what time of the day did you come into

24 contact with Mr. Forjan?

25 A.  I'd have to look at my report to get an exact time.  I have a

1  copy of it right here, sir.

2  Q.  Okay.  If you need it to refresh your memory.

3  A.  Looks like it was about 6:41 p.m.

4  Q.  And was Mr. Forjan driving a vehicle?

5  A.  Yes, he was.  It was a white flatbed pickup truck.

6  Q.  I'm going to show you what's been admitted into evidence as

7  Government Exhibit #2.  It should come up on the screen shortly.

8  Is that the vehicle Mr. Forjan was driving?

9  A.  It -- I can't say for certain, but it appears to be the same

10  vehicle, yes.

11  Q.  Well, you've seen the exhibit video -- I mean, the pictures

12  that were taken of the truck Mr. Forjan had, right?

13  A.  I have not seen the pictures yet, sir.

14  Q.  Okay.  Well, was he driving a truck?

15  A.  He was.

16  Q.  And what kind of truck was it?

17  A.  It was a -- I believe it was Ford flatbed pickup, four door.

18  Q.  Okay.  Now, why did you stop that particular vehicle?

19  A.  On that evening, I was working on patrol and I received a

20  phone call from Springfield Police Department Officer Jason

21  Copley.  He stated that he was watching a known narcotics house,

22  and there was a vehicle that he was interested in that was

23  leaving the house.  And he asked me if I could conduct a traffic

24  stop on it and see who it was and possibly investigate further as

25  towards the narcotics portion of his investigation.

Q.  Okay.  So, the whole purpose, sole purpose of him contacting

you was for you to make a stop on a vehicle that he believed was

associated with drug activity, is that correct?

A.  That's correct, sir.

Q.  All right.  And you indicated earlier that you -- and your

report also indicates that you had stopped this vehicle at around

6:41, is that correct?

A.  That is correct, sir, yes.

Q.  All right.  And can you tell the Court what happened when you

stopped the vehicle?  What did you do?  Tell us, since we weren't

there, let us know what happened.

A.  I initially made contact with the individual that was later

identified as Felix Forjan.  I made contact with him at his

driver's window.  Advised him who I was, why I had stopped him.

I asked him for his driver's license and insurance.  We had a

conversation about his immigration status, how he does not have a

driver's license or I can't remember the exact details of it, but

there was something along the lines he was having some

immigration issues, and he was not allowed to apply for a

driver's license in the United States anymore.

Q.  Let me back you up a little bit.  When you first observed

this vehicle, when you first got the communication from Detective

Copley, Officer Copley, you had come -- you actually was in the

opposite direction of the vehicle, is that correct?  You were

traveling in the opposite direction of the vehicle?

A.  When I was on the phone with Officer Copley, he gave me a

brief description of the vehicle and where it was traveling at.

I was -- by the way he described it, I assumed that he was

following the vehicle, but I couldn't say for sure.  But as he

gave the description of the vehicle and the location of the

vehicle, I actually happened to be driving up to the exact

intersection where he told me that the vehicle was heading

towards.  So, me and the suspect vehicle met at the intersection

at the exact same time.  He continued going down Main Street and

I pulled in right behind him.

Q.  Okay.  And when you first saw the vehicle, did you make any

observations about that vehicle?

A.  The license plate on the front of the vehicle had a December

'16 expiration sticker on it.  This being the middle of December,

state statute said that the plate was expired.  He had expired

registration on his truck.

Q.  So, you pulled -- you say you pulled in behind it after it

passed you, is that correct?

A.  Yes, sir.

Q.  And you conducted a stop at 6:41.

A.  Correct.

Q.  You indicated you went up to the driver's side of the vehicle

and made contact with Mr. Forjan.

A.  I did.

Q.  You asked for his driver's license?

A.   I did.  I asked him for his driver's license and his

insurance.  So, he told me about his driver's license situation.

I got other identifying information from him.  He said he at one

point had been in possession of a Missouri operator's license,

but he hadn't had one for some time.  So, I got his full name,

his date of birth and his Social Security number from him.  And I

returned to my car and ran Mr. Forjan's information through

dispatch to see if I could get positive ID on him.

Q.   So, he had no driver's license --

A.   Correct.

Q.   -- to operate the vehicle that he was in?

A.   Correct.

Q.   And you had a conversation.  How long was that conversation

you had with him at the, I guess the driver's side?

A.   During the initial contact, we spoke for some time.  Kind of

had a pretty good rapport going on.  I was a veteran.  He had

told me he was a veteran.  And so talked a little bit about the

Army for a minute.  Once I found out -- positively identified him

back at my car, when I re-approached the car, we spoke again, for

a short period of time, before I started with further

investigation into the stop.

Q.   Okay.  Now, so at this point, you talked to him on the side

of the road, you have a conversation with him.  He explains about

his license.  He can't have a license.  Didn't have a driver's

license or Missouri operator's license.  He had no -- did he have

1  any proof of insurance?

2  A.   That's another thing.  When I re-approached the car, he said

3  he might have insurance over in the glove box.  So, he went

4  around to the other side of the car and went through the glove

5  box on the passenger's side looking for his insurance, and I

6  believe he, if I remember correctly, he found an insurance card

7  in the glove box, but it was expired for some time.  So, he had

8  no valid proof of insurance on him or in the vehicle.

9  Q.   Okay.  At this point, you have no driver's license, no valid

10  insurance.  You went back to your vehicle.  You try to run

11  checks.  Now, when you say run checks on him, what do you mean by

12  that?

13  A.   I just give the information that Mr. Forjan had given to me.

14  I give it to dispatch and they run him through a couple different

15  databases to see if he has any warrants, check his driving

16  record, driving history, things of that nature.

17  Q.   And how long does that take?

18  A.   Depending on the radio traffic and things going on at the

19  time, it could take anywhere from 15, 20 seconds up to --

20  Q.   I'm talking about what --

21  A.   -- five, ten minutes.

22  Q.   How long did it take?

23  A.   I don't remember exactly on that occasion how long it took

24  for dispatch to come back with a return on him.  Typically, it's

25  a minute or two for -- you know, I don't remember what night this

1  was.  But around 6:41 it's typically busy, so it's not

2  unreasonable to think that it would be two, three minutes before

3  I ever got a return.

4  Q.  Okay.  So, you stop at 6:41, talk to him a little bit.  How

5  long is that conversation alongside of the road?  Three minutes?

6  Four minutes?

7  A.  Probably at least, yeah.  Like I said, we had a pretty good

8  conversation, you know, friendly conversation just about his

9  immigration status and the Army, things of that nature, maybe

10  three, four, five minutes long at least.

11  Q.  Then you go back to the car, is that right?

12  A.  Correct.

13  Q.  You have the information.  You radio that to dispatch?

14  A.  Correct.

15  Q.  And radio dispatch then takes about, what?

16  A.  Two, three, four minutes, maybe.

17  Q.  After you receive the -- what did you receive from dispatch

18  at that point?

19  A.  I would have to look at my report.

20  Q.  If you need to look at your report to refresh your memory.

21  A.  Okay.  Dispatch informed me that Mr. Forjan had been expired

22  -- his driver's license had been expired since 2011.

23  Q.  So, once you had that information, what's the next thing you

24  do?

25  A.  I recontact Mr. Forjan back at his vehicle, advise him of

1  everything that's going on.  He's got no insurance, no driver's

2  license, you know.  Basically, just updating him on everything

3  that's happened so far.

4  Q.  Are you planning to write citations or?

5  A.  Correct, yes.  With no driver's license, Mr. Forjan -- I

6  wasn't going to let him drive away from the scene of the traffic

7  stop but I hadn't informed him yet, but at some point, his

8  vehicle was going to get towed, and he was going to, you know, if

9  nothing came from the narcotics investigation, he would have

10 eventually had to have possibly call for a ride.  But at that

11 point I'm not letting Mr. Forjan drive a vehicle with no

12 insurance, expired registration and him no driver's license.

13 There was no way he was going to drive away from the traffic

14 stop.  I just hadn't informed him of that as of that time just to

15 keep things calm.

16 Q.  Okay.  When you first asked him about the vehicle itself, did

17 he tell you he owned that particular vehicle?

18 A.  If I remember correctly, he said that the vehicle actually

19 belonged to his daughter.

20 Q.  Okay.

21 A.  It was their -- her work truck or something along those

22 lines, and he had borrowed it from her.

23 Q.  So, you're back at the vehicle.  You did the dispatch.  You

24 find out that he has no valid license.  You get ready to prepare

25 to issue him citations, and I imagine you were going to ask him

1  -- you were going to tow the vehicle, is that correct?

2  A.  Correct.  We were in the middle of the street.  If we were in

3  a parking spot somewhere, I maybe could have left it in a parking

4  spot.  And I try to be as -- you know, I don't try to make

5  people's life any harder than I have to, but, you know, we were

6  in the middle of the street.  There was really no way around not

7  towing it.

8  Q.  Now, when the vehicle is towed, is it inventoried prior to

9  towing?

10 A.  It is, yes.

11 Q.  So, you're still, your initial purpose for the stop at this

12 point after traffic violations still was left undone, is that

13 correct?

14 A.  Correct.

15 Q.  So, did you ask him, Mr. Forjan, permission to search the

16 vehicle?

17 A.  I did.  I asked him for consent to search his vehicle and he

18 denied me consent.

19 Q.  What did he say?  Specifically, look at your report and see

20 what he said.

21 A.  I asked Mr. Forjan for consent to search his vehicle and he

22 says it was a company truck that belonged to his daughter and he

23 was not comfortable with me searching the vehicle.

24 Q.  Okay.  You say he wasn't comfortable with you -- but he never

25 said no, not to search the vehicle?

A.   I cannot recollect at this time what his exact verbiage was,

sir.

Q.   But your report reflects what you perceived that to be on the

night in which this happened, is that correct?

A.   Correct.

Q.   All right.  So, what happens after you start doing this?  Did

you remove him from the vehicle at some point?

A.   I did.  I asked him to step out of the vehicle and wait at

the rear of the vehicle while I went back to my car to start

writing out some tickets.  When I pulled him out of the vehicle,

you know, it's common safety practice for me just pat him down,

make sure he doesn't have any weapons on him because my head is

going to be, you know, writing tickets.  So I can't keep a visual

on him --

Q.   Right.

A.   -- for every second while we're out there.  So, I pat him

down for weapons, make sure he doesn't have any weapons.  As I

pat him down, he had a cell phone and a pack of cigarettes on him

that he removed from his pockets and set on the flatbed of the

truck.  I asked him not to use his cell phone while we're there

on the traffic stop as another safety precaution.  And I went

back to my -- (clearing throat) excuse me -- I went back to my

patrol vehicle and began writing citations for the infractions

that I discovered at that time.

Q.   Okay.  How far is your vehicle from where Mr. Forjan is

1  standing?  How far back?

2  A.   Maybe 10, 15 feet.

3  Q.   Okay.

4  A.   From my bumper to his bumper.

5  Q.   So, you go back -- you said you went back to your vehicle to

6  start writing citations?

7  A.   Correct.

8  Q.   Did you also make a call for a K-9 unit at that time?

9  A.   I did.  I requested a K-9 unit.  I believe it was 6:54 is

10  when I requested a K-9 unit to my location.

11  Q.   Okay.  8:41 is the stop -- I mean, 1841 is the stop.  1854

12  you request a K-9?

13  A.   I believe that's correct, yes.

14  Q.   Okay.  And at that point, do you start writing your

15  citations?

16  A.   Yes.

17  Q.   And how long does that take?

18  A.   I'd have to look at my report.  I believe I noted it in my

19  report exactly when the K-9 showed up.

20  Q.   Will you refresh your memory with your report, please.

21  A.   At 1906 the K-9 arrived, and I do specifically remember is

22  when the K-9 arrived at 1906, I had just finished writing my

23  first citation.  I believe it was for no insurance.  But I'm just

24  going off of memory here on that one.  I don't necessarily

25  recollect which one I wrote, but I believe it was for the

1  insurance.

2  Q.  So, you had another citation to write at that time?

3  A.  I had two more I could have written, the no driver's license

4  and the failure to register motor vehicle.

5  Q.  So, tell us what happened once the K-9 arrives?

6  A.  Do you mind if I --

7  Q.  No, go ahead.  Refresh your memory.

8  A.  So, Officer Wilson from Ozark PD and his dog, Bump, after

9  they arrived, I gave Officer Wilson a brief description of the

10  events that led up to that time right there.  He took Bump and

11  did an exterior sniff of the vehicle.  At that time, the -- I

12  wasn't aware of the dog indicating on anything on the exterior of

13  the vehicle.  But Bump did the sniff.  After Bump was done doing

14  his job, Officer Wilson indicated to me that --

15         MR. WOODY:  Objection, Judge.  I believe that calls for

16  hearsay.

17         THE COURT:  I'm going to overrule the objection.  It

18  goes to the state of mind of the officer.

19         THE WITNESS:  I was notified by Officer Wilson that the

20  dog had indicated on Felix's cigarette pack that he had set down

21  on the flatbed of the truck when I pulled him out.

22  BY MR. McGULL:

23  Q.  Is this conversation between you and the Officer Wilson, is

24  it in close proximity to Mr. Forjan or can he hear or are you

25  further away?

A.   I'm close enough to where I can keep an eye on him, but we're

far enough away to where he can't hear our conversation.

Q.   So, after Officer Wilson gives you this information about the

dog hitting on the cigarette pack, where was the cigarette pack?

A.   The cigarette pack was located on the back portion of the

flatbed truck.  It was just sitting on the flatbed.

Q.   What did you do next in your investigation?

A.   Once Officer Wilson indicated to me that the dog had

indicated on the cigarette pack, I approached Mr. Forjan and

asked him why the narcotics dog would have indicated on his

truck.  Mr. Forjan explained to me that he smokes marijuana, and

that there were possibly some leftover marijuana cigarettes on

the floorboard of his truck.  When I asked him why the dog would

indicate on the cigarette pack, Mr. Forjan indicated to me that

that was where he kept the joint he had smoked earlier in the

day.  He kept it in his cigarette pack.

Q.   And at that point, what did you do as an officer?

A.   At that point, with Mr. Forjan's admission that, you know,

there was possibly marijuana in the truck, I took that as

probable cause to search the vehicle to try to locate any other

illegal narcotics that I could find in the vehicle.

Q.   Okay.  And can you describe to the Court your search inside

the vehicle?  Describe what's in the vehicle and how did you

conduct your search.  First of all, how did you conduct your

search?

A.   Initially, I kind of have the same routine I like to do.   I
always like to start, if I'm by myself, I like to start on the
driver's side and do everything that's within reach of the
driver's area or what they call the schemiel circle.   And I'll
break the car up into quadrants.   So, I start with the driver's
side and move over to the passenger's side.   Do that quadrant of
the vehicle.   And then the back was just basically one big
flatbed area.   It's a bench seat in the back, if I remember
correctly.   And there was a bunch of clothes strewn about.   It
looked like maybe someone had been traveling quite a bit in the
truck, possibly sleeping in there.   It was kind of dirty with
wrappers and stuff like that.   But so, I searched the front of
the vehicle.   I didn't find -- I don't believe I found anything
in the driver's side.   I searched the passenger's side, didn't
find anything.   And then as I went to the back seat of the
vehicle, in the center of it was a tall clothes hamper full of
what I believed was dirty clothes at the time.

Q.   Okay.   Pause you right there for a second.   I'm going to show
you what's been marked for identification purposes as
Government's Exhibit #3.   I want you to take a look at that and
see if you recognize that item I just handed you.

A.   I believe that's the dirty clothes basket that was sitting in
the rear passenger portion of the truck that Mr. Forjan was
driving.

Q.   Is that picture a true and accurate depiction of the clothes

1  basket in Mr. Forjan's truck on the night of December 20, 2016?

2  A.  Yes, I believe so, yes.

3       MR. McGULL:  Your Honor, I would move to admit

4  Government's Exhibit #3.

5       THE COURT:  Any objection, Mr. Woody?

6       MR. WOODY:  No objection, Your Honor.

7       THE COURT:  Government's Exhibit #3 will be admitted

8  into evidence without objection for the limited purpose of this

9  hearing only.

10  BY MR. McGULL:

11  Q.  After you discovered the clothes basket, what did you do

12  next?

13  A.  I began removing items from the top of the clothes basket to

14  see what was inside of it.

15  Q.  And did you find anything inside?

16  A.  I found six, for lack of a better term, bundles of something

17  that was wrapped up in black electrical tape.  I found it to be

18  not conforming with the rest of the stuff that was in the basket,

19  which was all dirty clothes.  It just -- it stood out, for lack

20  of better terms.

21  Q.  I'm showing you what's been marked for identification

22  purposes as Government Exhibit #4.  I ask you to take a look at

23  that item and see if you recognize it?

24  A.  Yes, those are the black bundles that I had found inside the

25  clothes basket that evening.

Q.  Is that photograph a true and accurate depiction of the

bundles that you saw on December 20th, 2016, in the rear

passenger portion of Mr. Forjan's truck?

A.  It is, sir, yes.

        MR. McGULL:  At this time, Your Honor, I would move to

admit Government's Exhibit #4.

        THE COURT:  Any objection, Mr. Woody?

        MR. WOODY:  No objection.

        THE COURT:  Government's Exhibit #4 will be admitted

into evidence for the limited purpose of this hearing only

without objection.

BY MR. McGULL:

Q.  At this point, as an officer, what are you thinking?  What's

going through your head?

A.  I believe I had just discovered illegal narcotics.  I wasn't

100 percent sure, but with the previous information that I had

been given from Officer Copley and these things looking at me, I

was pretty confident I had -- there was narcotics inside of each

one of those bundles.

Q.  Did you do anything to dispel your suspicion?

A.  I cut open one of the bundles to look inside, just to make

sure.  I'd hate to, you know, send someone to jail or take

someone to jail for rolling around with, you know, a bunch of

super balls taped up in electrical tape or something.  So, I want

to verify what it was.

1  Q.  Okay.  What did you do?  You say, you opened one of the

2  bundles.  What was, what was --

3  A.  I --

4  Q.  Go ahead.  I'm sorry.

5  A.  I cut it open with a knife and got down to the -- it was

6  electrical tape.  Once I cut through the electrical tape, there

7  was a bunch of Saran wrap and axle grease wrapped up.  Once I got

8  through those, there was a clear plastic bag with a Ziploc bag,

9  and inside that Ziploc bag was a crystal-like substance that I

10 recognized from training and experience to be methamphetamine.

11 Q.  I'm handing you what's been marked for identification

12 purposes as Government's Exhibit #5.  I want you to take a look

13 at that and tell me if you recognize that item?

14 A.  It appears to be the contents of the single bundle that I

15 opened up.

16 Q.  And is it a true and accurate depiction of the bundle that

17 came from Mr. Forjan's rear passenger truck?

18 A.  It is, sir, yes.

19 Q.  After you opened it, is that correct?

20 A.  Yes, after I opened it.

21         MR. McGULL:  I would move to admit Government Exhibit

22 #5.

23         THE COURT:  Any objection, Mr. Woody?

24         MR. WOODY:  No objection.

25         THE COURT:  Government's Exhibit #5 will be admitted

1  into evidence for the limited purpose of this hearing only

2  without objection.

3  BY MR. McGULL:

4  Q.  Did you conduct any field test on the substance that you

5  found?

6  A.  Yeah, I used the methamphetamine field-test kit on it, and it

7  field-tested positive for methamphetamines.

8  Q.  And looking at Government Exhibit #5, can you describe to the

9  Court, what are we looking at there?

10           THE COURT:  I believe this is Exhibit #6.

11           MR. McGULL:  Oh, I'm sorry.  No, it's #5.  It's #5.

12           THE COURT:  It's #5.  Okay.

13           THE WITNESS:  It appears that that's the bag that I

14  opened up sitting on top of the bundles that I had not opened,

15  and the white stick looking thing at the bottom of the screen is

16  the methamphetamine field-test kit.  What you typically do is the

17  white-tipped portion there is made of some type of porous

18  material.  You rub it on whatever substance you believe is

19  methamphetamines.  And once you do that, there's a glass amulet

20  inside of the longer portion.  You squeeze it.  It breaks on the

21  inside.  Whatever that chemical reaction is goes down to the

22  porous material at the end, and if it turns blue, then whatever

23  substance you rubbed it on previously is testing positive for

24  methamphetamines.

25  BY MR. McGULL:

1  Q.  Looking at Exhibit #5, I see the tip of that vial there is

2  blue.  Is that what you look for?

3  A.  Correct, yes.

4  Q.  So, that was a positive result of the items that you tested

5  that night?

6  A.  Yes.  The tip of that methamphetamine tester indicated that

7  whatever was rubbed on the tip of that tester was positive for

8  the chemical makeup of methamphetamine.

9  Q.  Now, at this point when you found that substance, what was

10  the next thing you did?

11  A.  I called my patrol sergeant on the telephone and let her knew

12  -- or let her know what exactly had transpired during my traffic

13  stop.

14  Q.  Did you have any other interaction with Mr. Forjan?

15  A.  I'd have to look at my report and see what --

16  Q.  To refresh your memory.

17  A.  I had more interaction.  I'd just, to be specific, I'd rather

18  look at my report and verify.  Just to backtrack a little, as

19  soon as I discovered the black bundles in the back of the car, I

20  asked Officer Wilson to place Felix in hand restraints.

21  Q.  So, prior to this time, when you're doing your search and

22  when he was first removed from the vehicle, he never had any

23  restraints on?

24  A.  No.  Not until I found the black bundles in his truck.  He

25  had no hand restraints on him.

1  Q.  And what did you do next after you notified Officer Wilson to

2  place Mr. Forjan in restraints?

3  A.  After he placed him in restraints, he -- I requested he put

4  him in the cage portion of my patrol vehicle, and he stayed there

5  for the remainder of the traffic stop.

6  Q.  And at some point, did you make contact with Mr. Forjan?

7  After you've done your search and everything?

8  A.  The only contact I made with Mr. Forjan afterwards, I did no

9  interview of him on scene there.  When I called the sergeant, the

10  sergeant showed up on scene with the sheriff.  I had no

11  conversations with Mr. Forjan until we were transporting him to

12  the Christian County Jail.

13  Q.  Did you read him his *Miranda* rights?

14  A.  I did not read him his *Miranda* rights.  I'd have to check on

15  my report, but I don't -- I never asked him any guilt-seeking

16  questions, so, if I read them, it was just out of precaution but.

17  Q.  Well, do you want to check your report to make sure that --

18  A.  All right.  After looking at my report, I'd like to clarify.

19  Q.  Excuse me.  I'm sorry.  I didn't hear you.

20  A.  After reading my report, I'd like to clarify the *Miranda*

21  situation.

22  Q.  Sure.  Go ahead.

23  A.  All right.  After I had unwrapped the substance, after Mr.

24  Forjan was already placed in hand restraints, I read him his

25  *Miranda* rights.  And after I had read them to him, I asked him if

1  he understood them and if he wished to talk.  He said -- yeah, he

2  lawyered up initially.  No further verbal interaction was done

3  there on the scene with him, by me at least.

4  Q.  You say you read him his *Miranda* rights.  Do you have a

5  *Miranda* card that you read from?

6  A.  Yeah, I keep one in my wallet at all times, yes.

7  Q.  And that's what you used to read him his *Miranda* rights, is

8  that correct?

9  A.  That's correct, sir.

10 Q.  Okay.  Now, at some point, you notify, like you would do when

11 you're getting ready to tow a vehicle, you notify a towing

12 service, is that correct?

13 A.  That's typically what's done, yes.

14 Q.  Okay.

15 A.  If I remember correctly on this incident, I think the

16 sergeant took care of the towing.  I don't know if I called the

17 towing company or not, but.

18 Q.  Why don't you look at page 4 of your report to refresh your

19 memory.

20 A.  St. John's Towing was requested.  He requested it.  It

21 doesn't say in the report.  Somebody on scene requested St.

22 John's to come en route.

23 Q.  But you released, because you were the on-scene investigator

24 or officer on this particular case, you released the truck to the

25 towing service, is that correct?

1  A.  I believe so, yes.

2  Q.  Okay.  Now, at this point, it is probably 9:00 in the evening

3  now?

4  A.  I'm not sure what time I actually cleared the traffic stop,

5  but.

6  Q.  Would it be in your report?  Why don't you take a look at it

7  to refresh your memory?

8  A.  It's 2100 hours is when the towing service arrived.

9  Q.  Okay.  So, where is Mr. Forjan after the towing service is

10  secured, you released the truck to the towing service, what

11  happens next?

12  A.  He's in the back of my patrol car.  I transported him to the

13  Christian County Jail.

14  Q.  And is there anything said between you and Mr. Forjan as they

15  -- as you're transporting him to the Christian County Jail?

16  A.  I recollect trying to make some small talk with him on stuff

17  other than the events of that evening.  Mr. Forjan was quite

18  concerned about his family, and he kept on referring to the

19  danger that his family is in because of the events of that

20  evening.  It seemed like any time I tried to change the subject

21  to talk about something else, he was -- kept on relaying his

22  concern for his family's safety.  I asked him if there was

23  anything I could do to help the family or, you know.  Who's the

24  family in danger of?  He had said that all that information could

25  be found in his telephone.

Q.  Now, did you have any other contact with DEA at -- Officer

Brett Leslie -- Detective Brett Leslie?

A.  He showed up during the traffic stop shortly after my

sergeant and the sheriff arrived on scene.

Q.  Okay.  And did you release any of the evidence to Detective

Brett Leslie?

A.  Yeah, I released the -- I'd have to check in my report, but I

would say, I believe I released the narcotics and the telephone

to Detective Leslie.

        MR. McGULL:  I believe that's all the questions I have

of this witness, Your Honor.

        THE COURT:  All right.  We're going to take a ten-minute

recess.  Be back at 10:30.  You may stay in the courtroom,

Officer.  You can use the restroom.  We'll be in recess.

        (Court in Recess from 10:22 a.m. until 10:28 a.m.)

        THE COURT:  We're back on the record, and I believe that

the Government had finished its direct examination.  Officer, you

can get back on the witness stand.

        JEFFREY HOOK, PREVIOUSLY SWORN, RESUMES STAND

        THE COURT:  Mr. Wood, cross-examination.

        MR. WOODY:  Thank you, Your Honor.

                      CROSS-EXAMINATION

BY MR. WOODY:

Q.  Good morning.

A.  Good morning, sir.  How are you?

1   Q.  Okay.

2   A.  This is like the middle of the night for me.

3   Q.  Well, good evening then.  So, just so I'm clear, based on

4   your testimony and your report, you pulled this white flatbed

5   truck over for an expired license plate?

6   A.  Correct.

7   Q.  Okay.  But Detective Copley was the one who had called you

8   and asked that you be on the lookout or something for this

9   vehicle approaching a specific intersection?

10  A.  From my understanding, there was an ongoing investigation at

11  the house that the truck had just left, and Officer Copley asked

12  me to help him investigate the vehicle that was leaving that

13  known narcotics house.

14  Q.  Did he ask you to stop it?

15  A.  I don't remember what his specific words were.

16  Q.  But according to your testimony and report, that's not why

17  you stopped him?

18  A.  As far as?

19  Q.  What Detective Copley told you was not why you stopped the

20  vehicle.  You stopped it for an expired plate.

21  A.  I stopped it because it was a known -- it was a vehicle

22  leaving a known drug house.  To further my PC, I used the expired

23  plates on the truck for further probable cause to conduct the

24  traffic stop on the vehicle.

25  Q.  So, you did then stop it based on what Detective Copley told

1  you?

2  A.  It was a mixture of both the expired tags and the truck

3  leaving the known drug house, yes.

4  Q.  And in your report, you indicated that you conducted a

5  traffic stop on a white F-250 four-door, flatbed truck for an

6  expired license plate.

7  A.  Correct.

8  Q.  So, when you saw the vehicle, though, based on what you're

9  saying, it sounds like you were going to stop the vehicle based

10 on what Detective Copley told you no matter what?

11 A.  I wouldn't say that.  I couldn't tell you what I would do in

12 a hypothetical, theoretical situation.  My first instinct is, as

13 a patrol deputy, find PC for the stop, and that way you won't

14 have any issues.  I did that off -- right off the bat, so.

15 Q.  You believe you did that based on an expired license plate?

16 A.  Correct.

17 Q.  Did you see the license plate on the front or the back of the

18 truck?

19 A.  It was on the front.  There was no plate on the back of the

20 truck.

21 Q.  And you made the stop you said, I believe, at 1841, is that

22 right?

23 A.  That's correct.

24 Q.  6:41 is when you stopped the vehicle?

25 A.  Correct.

1  Q.  And prior to that, you observed no additional traffic

2  violations?

3  A.  None that I can recall off the top of my head, no.

4  Q.  And during the stop, after you had activated your emergency

5  lights, he pulled -- the driver of the truck pulled over

6  normally.

7  A.  He was still in traffic.  So, I don't know what your

8  definition of normally would be, so.

9  Q.  Well, --

10 A.  He pulled over to the shoulder of the road.  There was -- it

11 wasn't anything crazy.  I've seen it done a 100 times.

12 Q.  And you didn't indicate any problems in your report.

13 A.  No.

14 Q.  You didn't indicate any abnormalities regarding the stop or

15 pulling over in your report.

16 A.  No.

17 Q.  Had there been something glaring, you're trained to include

18 all relevant information in your report?

19 A.  Right.  It's just preference, I prefer he would have pulled

20 completely off the road into a parking space, but.

21 Q.  Okay.

22 A.  In my experience, you got a 50/50 chance every time you pull

23 someone over whether they're actually going to think about safety

24 or not.

25 Q.  Nothing unusual then about the way he pulled over?

1   A.   About the way he pulled over?

2   Q.   Right.

3   A.   No.  No, sir.

4   Q.   And as you're behind the driver, your lights are pointing

5   toward the vehicle?

6   A.   Correct.

7   Q.   You observed no furtive movement, you would call it, on

8   behalf of the driver?

9   A.   No.

10  Q.   Do you have any photographs of his license plate or his tags?

11  A.   I do not.

12  Q.   Did you ever acquire any printout or anything of the vehicle

13  registration?

14  A.   I did not.

15  Q.   Do you have any physical evidence or evidence otherwise other

16  than your word to establish that this license plate was actually

17  expired?

18  A.   Not with me in court, no.

19  Q.   And you said that there was no license plate on the back of

20  the truck.  There are some vehicles that's not required?

21  A.   Correct.

22  Q.   Now, you stated after you approached him, you started a

23  conversation, and he was explaining to you sort of an immigration

24  issue as to why he couldn't get his license renewed.

25  A.   Correct.

1  Q.  And it wasn't until that conversation, and then you ran his

2  information that you discovered that his driver's license was

3  expired.

4  A.  No, I believe during our initial conversation, he had made it

5  clear that he had had a Missouri driver's license in the past,

6  but he was never able to renew it.  So, that tells me right there

7  that he's probably going to be expired.

8  Q.  So, he told you that it was expired?

9  A.  He gave me all the information that would lead me to believe

10 it was expired.  The DOR return just verified it.

11 Q.  And you didn't know Mr. Forjan before that day?

12 A.  I had never met him before, no, sir.

13 Q.  Now, at some point, you allowed him an opportunity to get out

14 of the vehicle and go around to the glove box to look for the

15 insurance.

16 A.  Correct.

17 Q.  And he gave you an expired insurance card.

18 A.  Correct.

19 Q.  He couldn't find the new card.

20 A.  Correct.

21 Q.  Did he ask you for an opportunity to call his daughter to try

22 to get an updated card?

23 A.  Not that I recall.

24 Q.  Once he gave you the expired card, you had all of his

25 information, and that's when you went back to your vehicle and

1  ran his information.

2  A.  I can't say off the top of my head whether he checked for the

3  insurance before I went back and ran him or after.  I'd have to

4  look at my report and see what it says, but I don't recall

5  whether, if he, you know, once I went back to the car and ran

6  him, I don't know if he looked for his insurance before or if

7  that was afterwards.

8  Q.  So, before you asked him out of the vehicle, though, you had

9  already asked him for permission to search the truck?

10  A.  I'd have to look at my report to be 100 percent on it.

11  Q.  Feel free to refresh.

12  A.  I asked him to exit the vehicle, and then after he --

13  according to my report, after he was already out, I asked him if

14  he had anything illegal in his car.  At that point I asked him

15  for consent.

16  Q.  You say as he exited is when you asked him if he had any

17  vehicle, or anything illegal in his car?

18  A.  Correct.

19  Q.  And then he said he did not.  And once he stepped out, that's

20  when you asked him for consent to search?

21  A.  Correct.

22  Q.  Which he denied?  Or he said he wasn't comfortable because

23  it's his daughter's work truck?

24  A.  Exactly.

25  Q.  And at that point, you allowed him to look for insurance.

1  A.  May I?

2  Q.  Feel free.

3  A.  Correct.

4  Q.  And once he couldn't find it, you had him sit on his bumper

5  while you ran his information?

6  A.  I had already ran his information.  I went back to my

7  vehicle.  I sat him on the bumper, I went back to my vehicle to

8  start writing his traffic citations.

9  Q.  Okay.  And he's cooperative with you at this point, right?

10 A.  Correct.

11 Q.  Now, when you're up by his window before you asked him out,

12 you don't observe the odor of any narcotics?

13 A.  No, sir.

14 Q.  No odor of marijuana or alcohol?

15 A.  (Witness responds in the negative).

16 Q.  And Mr. Forjan's complying with your requests and answering

17 your questions?

18 A.  Other than allowing me consent to search the vehicle, he was

19 compliant, a generally pleasant individual.

20 Q.  And he wasn't excessively nervous or anything like that at

21 the time?

22 A.  I don't know Mr. Forjan well enough to know what his nervous

23 tendencies are, but nothing stood out.  He wasn't sweating

24 profusely or fidgeting or anything along those lines.

25 Q.  Because there's probably sometimes where you would indicate

1  that in your report if someone's clearly nervous?

2  A.  Exactly.

3  Q.  Nothing like that here?

4  A.  Not that I see, no, sir.

5  Q.  And when you ask him, you said, to sit on his back bumper,

6  you were going to go fill out some paperwork, and that paperwork

7  was to write the tickets?

8  A.  Correct.

9  Q.  And as you went back there to do that, that's when you

10 requested a K-9?

11 A.  Yes, sir.

12 Q.  And that was at 1854?

13 A.  I believe so, yes.

14 Q.  So, then it took you from 1841 to 1854 to do kind of the

15 small talk and run his driver's license?

16 A.  Correct.  And allow him to look for his insurance.

17 Q.  And while you were going to fill out these tickets, are we

18 talking, do you hand-write the tickets or are they electronic?

19 A.  They're handwritten, sir.

20 Q.  And you had already ran his information.  You had his date of

21 birth.  You had his Social Security number.

22 A.  Correct.

23 Q.  You had his address?

24 A.  I had whatever his address was on his DOR return, whether it

25 was his up-to-date address, I don't know, but I had "a" address

1  for Mr. Forjan, yes.  There's other things too when you're

2  filling out the citations, you have to have some of the vehicle

3  information.  So, it's not unheard of to ask dispatch to e-mail

4  me the DOR return for whatever plate that I have, so I know the

5  vehicle year, the make, model, things of that nature to put on

6  the citation as well.

7  Q.  When you said it's not unheard of, do you know if you did

8  that here?

9  A.  I may have just asked Felix what year his truck is.  I can't

10 be for certain whether I did or not.

11 Q.  Now, when you had called Office -- it was Ozark Officer

12 Wilson that you called.  He was the K-9?

13 A.  Correct.

14 Q.  And you were in Nixa, correct?

15 A.  Correct.

16 Q.  And Officer Wilson with the K-9 got there at 1906?

17 A.  I believe that's correct.

18 Q.  So, from 1854 to 1906, 12 minutes, that's your testimony, all

19 you had time to do was to write one ticket in 12 minutes?

20 A.  Correct.

21 Q.  And all told, before the officer with the K-9 had gotten

22 there, it had been 25 minutes?

23 A.  If that's what your math is.

24 Q.  Well, 1841 to 1906?

25 A.  That's 19 plus another 6, 25.

1  Q.  Okay.  Now, once he got there, you stated that you observed

2  the dog do an exterior sniff of the vehicle?

3  A.  Correct.

4  Q.  And he didn't alert to anything during that exterior sniff?

5  A.  I'm not a K-9 handler.  I can't really testify as to what

6  Bump's alert signals are.

7  Q.  Officer Wilson never told you anything about him alerting to

8  the exterior of the vehicle.

9  A.  Correct.

10 Q.  According to him, the only thing that he alerted to was the

11 cigarette pack.

12 A.  That is correct.

13 Q.  Now, you stated in direct that you told at that point Mr.

14 Forjan, you asked him why would the dog alert on the truck?

15 A.  That is correct.

16 Q.  The dog didn't alert on the truck.

17 A.  That is correct.  To my knowledge, he had not.

18 Q.  And that's when he told you that he smokes marijuana, and he

19 had a marijuana cigarette in the cigarette pack earlier that day.

20 A.  And there was probably roaches on the floorboard of his

21 truck.

22 Q.  Well, and I was going to get to that.  But he told you he had

23 -- the marijuana cigarette that he had in his cigarette pack

24 earlier would be explanation as to why Bump would have alerted

25 there.

1  A.  Correct.  When I asked him why he alerted on the truck, he

2  mentioned about the roaches on the floorboard.  Then I asked him

3  about the cigarette pack, and he told me about the joint that he

4  had in there previously that day.

5  Q.  Because I believe you said, yeah, that -- on direct you said

6  that he told you there would be leftover marijuana cigarettes on

7  the floor, but his term was roaches?

8  A.  I consider them to be one and the same thing.

9  Q.  Well, a roach is a used joint.

10  A.  Okay.

11  Q.  Right?  Is that right?

12  A.  Yes.

13  Q.  Okay.

14  A.  Is a joint a used marijuana cigarette?

15  Q.  I didn't say -- you said leftover marijuana cigarette.

16  A.  Okay.  Leftover from previously being smoked on.

17  Q.  Okay.  So, when we say leftover marijuana cigarette, --

18  A.  I getcha.

19  Q.  -- you're talking about a roach?

20  A.  Roaches, yeah.

21  Q.  And you said based on him saying that there would be roaches

22  on the floorboard, your opinion was that that gave you reason to

23  believe there were narcotics in the truck?

24  A.  Correct.

25  Q.  And when you began your search, you said that you start on

1  the driver's side and then work your way over to the passenger's

2  side?

3  A.  Correct.

4  Q.  And you searched the floorboard obviously.

5  A.  Correct.

6  Q.  And you found no roaches in the floorboard.

7  A.  I did not.

8  Q.  So, at the time that you found no roaches in the floorboard,

9  that dispelled what he had told you previously?

10  A.  It had confirmed that, my belief that Mr. Forjan was lying

11  and making excuses on why the dog would have hit on his truck.

12  Q.  Well, but again, the dog didn't hit on his truck, correct?

13  A.  Correct.

14  Q.  The dog hit on a cigarette pack?

15  A.  I knew that.

16  Q.  And Mr. Forjan never said anything about there being

17  marijuana in the back seat?

18  A.  No, he did not.

19  Q.  He never said anything about there being marijuana anywhere

20  else in the vehicle?

21  A.  No, he did not.

22  Q.  And he never said there would be anything in the laundry in

23  the back seat?

24  A.  He did not.

25  Q.  And you found no marijuana in this cigarette pack, no loose

1  leaf marijuana there in the cigarette pack?

2  A.  I found no indications of marijuana use anywhere in the

3  vehicle.

4  Q.  And you found no contraband on Mr. Forjan?

5  A.  Not that I recall, no.

6  Q.  And you weren't involved in any way in the drug investigation

7  previously?

8  A.  No, sir.

9  Q.  And you weren't familiar with Mr. Forjan?

10  A.  Never heard of him before.

11  Q.  Or that vehicle?

12  A.  No, sir.  Or the house.  I couldn't even tell you the house

13  they were at.

14  Q.  Were you familiar with Detective Copley up until then?

15  A.  I was familiar with the name.  I had never met him

16  personally.

17  Q.  You never met him or worked with him?

18  A.  If I had worked with him, I didn't know.  I knew who -- I

19  knew the name and I knew who he worked for.  But I couldn't have

20  picked him out in a line-up.

21  Q.  Now, you stated that when he was -- when you noticed that he

22  didn't have a driver's license, you weren't going to let him

23  drive away.  Are there times that you contact family members for

24  people and allow them to pick up the vehicle?

25  A.  There are times, yes.

Q.   As opposed to having it towed?

A.   Correct.

Q.   Because I believe you said earlier you don't want to cause any more problems for people than necessary.

A.   I tend to try to help people.  The daughter being -- I believe she was from Pacific, Missouri.  That wasn't -- it didn't seem like it was going to be workable.

Q.   You didn't talk about any other family members who might live here?

A.   No, we didn't.

Q.   In Southwest Missouri?

A.   I may have asked him if he's got any close family members, but I don't recall.

Q.   Okay.

        MR. WOODY:  I don't have anything further at this time, Your Honor.

        THE COURT:  I just have a couple of quick follow-up before we get to any redirect.

EXAMINATION BY THE COURT:

Q.   Officer, I believe you've testified that when you stopped him, you told him why you had stopped him, and that was for the expired tags, is that correct?

A.   Correct.

Q.   And then it was through your contact that followed that that you found out about that he didn't have a valid driver's license

or proof of insurance, is that correct?

A.  Yes, Your Honor.

Q.  And then, on direct, I believe you indicated that you were,
you went back to the vehicle to write citations.  I know there's
been a lot of back and forth, and I'm trying to keep track of it
all.  But I believe you testified that you called for the K-9
unit at 6:54?

A.  Correct.

Q.  And that the K-9 unit arrived at 1906 or 7:06 p.m.  And at
that time, you had just finished writing the first citation.
What citations were you, did you intend to write based on what
you had discovered during the course of your traffic stop?

A.  The operating a vehicle without a license, the no insurance,
and I had -- I was going to have to look at the statute a little
bit better for the -- I'm sorry -- I was going to write no
insurance and operating a motor vehicle without a driver's
license.  And I had planned on looking at the statute for failure
to register motor vehicle because when they're driving someone
else's vehicle, it's kind of hard to stick someone with that type
of citation when it's not even their own car.  So, I was going to
have to look at the statute and see if him driving around with
the expired plate, which actual infraction that fell under.

Q.  So, I guess my question is is that when the K-9 officer
arrived, you were just in the beginning of writing the traffic
citations that you intended to write?

1  A.  I had just finished my first citation.  Hadn't even started
2  on the second one or possibly even the third one.
3  Q.  Now, there were some questions related to the alert of the K-
4  9.  But the K-9 did alert or at least you were advised by Officer
5  Wilson that the K-9 alerted for a positive reaction to the
6  presence of narcotics on the cigarette package?
7  A.  Correct.
8  Q.  That package had been in the possession of the defendant at
9  the time of the stop?
10 A.  Correct.  He pulled it out of his pocket once I pulled him
11 out of the car.
12 Q.  And you indicated through your testimony what some of your
13 basis for believing you had probable cause to search the vehicle,
14 but the fact that the cigarette pack had been in the vehicle with
15 the defendant and the dog alerting in a positive manner, did you
16 believe that gave you probable cause to search the vehicle then?
17 A.  Even without his supposed admission of the roaches being on
18 the floor of the car, him getting out of the car with the
19 cigarette pack that showed a positive indication from the dog, I
20 probably ran it by my supervisor.  But I'm fairly confident that
21 would have gave me probable cause to search the whole car as
22 well.  The admission or the fake admission of the cigarettes on
23 the -- or the roaches on the floorboard just gave me more, made
24 me feel more comfortable with it.
25 Q.  Just so we're clear, the dog sniff of the vehicle, you were

1  still in the course of your traffic enforcement, in fact, you had

2  two more tickets to write when the K-9 arrived and when the dog

3  alerted on the cigarette pack?

4  A.  Correct.

5           THE COURT:  Any redirect?

6           MR. McGULL:  No, Your Honor.

7           THE COURT:  All right.  May the witness be excused?

8           MR. McGULL:  Yes, Your Honor.

9           THE COURT:  All right.  Thank you, Officer.  You know,

10  Mr. Woody, when I've asked questions, I know I gave the

11  Government the opportunity for redirect.  If anything I asked has

12  given you any further recross, I will allow you.  Sorry, Officer.

13           MR. WOODY:  No, I understand.  I appreciate that.

14  Nothing else.  I mean, I think we've covered it all.

15           THE COURT:  Okay.  All right.  I just -- I realized that

16  I kind of opened the door to some matters that may have not been

17  covered.  All right.  Thank you, Officer.

18           THE WITNESS:  Thank you, Your Honor.

19           THE COURT:  You may be excused.  Any further testimony?

20           MR. McGULL:  No, Your Honor.

21           THE COURT:  Any evidence that you'd like to present, Mr.

22  Woody?

23           MR. WOODY:  Not at this time, Judge, just argument.

24           THE COURT:  All right.  I'll hear from the Government

25  first, and then I'll hear from defense.

1    MR. McGULL:  Your Honor, I believe the case law we

2 handed you, *United States vs. Rowe,* which came out just some 30,

3 45 days ago in December, kind of hits upon the issue that is

4 relevant to this case.  I mean, the defendant has cited

5 *Rodriguez*, but I think this is, and even *Caballes* has indicated

6 that the officer has the right to effectuate the purpose of the

7 stop.  The purpose of this stop was a drug investigation.  There

8 was a drug investigation going on.  The defendant left the drug

9 house.  The officer was alerted by the first officer who had PC,

10 probable cause to stop because he has reasonable suspicion --

11 probable cause that the vehicle that was leaving a known drug

12 house may be carrying contraband.  That was the initial purpose

13 behind Officer Copley reaching out to Officer Hook.  I mean, *Rowe*

14 kind of talks about that where we have somewhat of a transfer or

15 mutual PC established between officers that communicate to each

16 other.  So, Officer Hook, who had, at this point, and much like

17 in the *Rowe* case, established a secondary PC, independent of the

18 initial purpose behind the stop.  The secondary was the traffic

19 violation.  The whole purpose of this investigation was a drug

20 investigation, but the traffic stop gave him additional PC to

21 stop the vehicle.  Much like in the *Rowe* case where the Highway

22 Patrol -- a patrol person indicated in that case that, you know,

23 the confidential informant had told them in the *Rowe* case that,

24 yeah, this, the car was carrying contraband, and that the other

25 officer who was investigating the drug investigation, told the

Highway Patrolman to look out for this particular car, much like in our case, where Copley indicated to Hook, here's the truck that's possibly carrying contraband based upon my experience and knowledge, make a stop, stop this vehicle, and he did. But he developed an independent PC for another stop. That's a traffic violation, expired tags, no driver's license when he made contact with the individual, no proof of insurance in the vehicle. And even further, the officer continued to try to dispel the suspicion of the initial stop, which he asked for permission to search. Mr. Felix Forjan said I'm not comfortable. He never said no. He said I'm not comfortable because this is not my truck, which even brings up a standing issue.

THE COURT: Well, and I'm glad you mentioned that, is that I do intend to ask the parties. Neither party briefed the issue of standing. I am going to ask both parties to submit a briefing on the issue of standing. But you may continue, because neither party addressed that in their motions, so.

MR. McGULL: Even going past the standing issue, we have also inevitable discovery, Your Honor, because once he -- the officer found out, independent of the drug investigation, once he found out that this man did not have a driver's license, he indicated on his direct testimony, he wasn't going to let him drive away, which means that there was going to be an inventory of the car. An inventory would probably have found the drug -- narcotics anyway. So, we have the inevitable discovery theory,

on which we can proceed.  But I think that this case is much more in line with *Rowe*, and a lot of, I think, defense attorneys and a lot of courts have interpreted *Rodriguez* to mean that an officer -- I mean, a stop that is based upon, based upon traffic, but in this case, a stop that is based upon PC for drugs has to be investigated just like a traffic stop.  So, I mean, I think -- I think in this situation that there are several theories.  Standing, we have standing.  We have inevitable discovery.  But I really think it proceeds under what I think is the *Rowe* case, which is that there was probable cause to stop that vehicle for drug investigation.  The officer articulated that to the patrol officer who made the stop.  He took steps to try to dispel that reasonable suspicion by asking for consent to search.  He didn't get it.  He went through the protocol for the traffic violations.  He wrote the ticket.  He didn't do anything that would prolong this stop, even if he'd gone under the *Rodriguez* theory.  He indicated he wants to have conversation back and forth.  He went back, communicated with dispatch.  He was writing his ticket.  When he finishes writing the first ticket, that's when the K-9 unit came.  The whole stop took about roughly from 1841 to 1906 in 20 some, 25, 30 minutes or something like that, less than 30 minutes.  And in that time frame, the defendant provided him additional PC to search the vehicle by making those admissions that, hey, I have smoked -- why would the dog hit on your cigarette?  Or why would the dog hit on your truck?  He said

because I smoke marijuana, and there's probably roaches in the

car, which gave us PC to get in the car to do the search then.

So, I really think, Your Honor, I think there's not anything,

there's no Fourth Amendment violation in this particular case.

There are several theories we could proceed upon.  I'll be happy

to brief those after we've had an opportunity to get the

transcript.  I'm sure both parties would like to submit their

responses to why we think why -- the Government -- why the

Government thinks that no Fourth Amendment violations occurred

here.

THE COURT:  Thank you, Mr. McGull.  I will say, you

know, I've read the *Rowe* case, and I mean, and you know, this is

something I'm going to ask both parties to brief too, and even in

the Government's argument, sometimes, you know, the phrase

probable cause to stop and reasonable suspicion, they're used

interchangeably, but they're totally different concepts based

upon, you know, reasonable suspicion -- reasonable articulatable

suspicion is based on a *Terry* type of detention.  And then

probable cause to stop is, you know, sometimes I hear it being

argued interchangeably.  And so, when I look at the *Rowe* case,

the *Rowe* case has a specific confidential informant that alerts

law enforcement to a large shipment of drugs being driven in a

specific vehicle described by the CI.  And that that information

was conveyed to officers about the shipment, it says on the heels

of telling officers about a shipment via the mail.  So, the CI

has been corroborated. But then officers see the very vehicle that has been described by the CI. And so, you know, I think is *Rowe* easily, easily distinguishable from the facts that we have. And what I would ask the parties to again brief is whether the activity that was observed at the house in Nixa was sufficient to serve as a basis for an investigatory detention. I don't think *Rowe* is going to dispositive because that was a CI that had very specific information about a vehicle described specifically, a BMW by the CI. Officers then corroborate that. And there, you know, the court found that based on the fact that they had probable cause to believe that the BMW contained cocaine, the police were authorized, under the automobile exception, to stop, search and seize the vehicle without a warrant. And here, I think we would all agree, there was no specific CI information about this vehicle in particular. So, I don't think *Rowe* is in any way dispositive, but I do want the parties to brief whether the activity that had been observed at the house and based on the information that the officer had, was that -- was that a basis to conduct an investigatory detention of the driver of the vehicle. Again, I know that the Government has argued, too, there's actually another line or theory that was developed based on PC to stop the vehicle independent of what was observed at the house. But I'm not, you know, I think that the Court is going to ask again that the parties attempt to find case law that is more similar to the facts of this case. Again, I think there's an

alternative theory as for why the vehicle was pulled over. But I
don't find *Rowe* to be on point. I think it's easily
distinguishable. So, I am going to ask the parties, one, to
brief the issue of standing, because I think that is an issue
that's not even been explored. And I want them, in light of the
testimony today, to address the issue of standing, as to whether
the defendant even has standing to object to the search of the
vehicle. And then I also want there to be briefing on whether
the activity at the house and the officer's background, and the
CI information that I heard was just that that person at that
house was a distributor of narcotics, and there was nothing tying
this vehicle to the CI's statement. But I would be interested in
seeing if that information would be sufficient for an officer to
make a stop for a *Terry* type of detention. Mr. Woody, I'll hear
from you now.

MR. WOODY: Thank you, Your Honor. And to the Court's
credit, you stole some of my thunder because you touched on a lot
of the things that I was going to touch on. I think *Rowe* is
wholly inapplicable here, because, as the Court pointed out, it's
a CI specifically giving information about that specific vehicle.
That's not what we have here at all. This is a totally separate
situation, totally separate scenario. So, I don't think *Rowe* is
anything that really provides case law for the Court to consider
here. We have a lot of layers here, a lot of layers of the onion
though to think about, and the Court touched on a couple of the

points that I wanted to make. The Government continually talks
about this house here in Nixa on Farrow Lane as a drug house.
Realistically, the Court didn't hear evidence to establish that
this is a quote/unquote "drug house." The only evidence that the
CI provided to Detective Copley was that the resident of the
house in Nixa was known to distribute narcotics to a target of an
investigation in Springfield. That's it. That is what he
limited his testimony to was that that was the information that
he had concerning the resident in Nixa. That's it. There was no
information that he was distributing narcotics from that house.
No information from the CI that Felix Forjan was involved in
anything. No information from this CI that the occupant or
residents of that house was distributing narcotics to anyone
other than that one person in Springfield. That's the extent of
the knowledge of Detective Copley, and that should be the extent
of what -- of what Deputy Hook then could take from Detective
Copley because that knowledge, frankly, is very limited. This is
not a known drug house. There's no information that this is a
known drug house. Detective Copley, I believe, indicated during
his investigation, which started -- or from his surveillance
which started between 3:00 and 4:00 to that evening around 6:00
or 7:00. So, in those three hours, I believe he indicated four
vehicles, a white truck, the white flatbed truck, a motorcycle
and another car. Four vehicles over the course of those four
hours came and went from this residence. He said high traffic,

high-frequency traffic. Four vehicles in four hours. He
indicated that it would be akin to a business. Well, that would
be a pretty slow business if we're talking four vehicles in four
hours. But he also, of note, indicated that a white flatbed that
we're talking about here that Mr. Forjan was driving was there
for 45 minutes. And he even said, it's not as short as what we
typically see that would indicate a drug transaction. And he's
right, 45 minutes is not a drug transaction. Given the
additional details that he didn't watch Mr. Forjan carry anything
in or carry anything out. He certainly would have noticed if he
had a duffle bag or a laundry hamper full of stuff. He would
have noticed that. That would have given -- raised suspicion
right there, but he didn't. Any suspicion that he had, and case
law is wrought with examples of simply leaving, even a known drug
house in and of itself is not reasonable suspicion. That, by
itself, is not reasonable suspicion. There has to be more. And
there's not more here. In fact, there's not even him leaving a
known drug house. That's not enough. What the Court heard here
is not enough for reasonable suspicion. And what we're talking
about is reasonable suspicion to prolong the stop. That's what
we're realistically talking about. So, that's the first kind of
layer of the onion we have to decide. The next layer of the
onion is whether the deputy really had probable cause to stop the
vehicle. All you heard was that he thought it had expired
plates. You saw no evidence to demonstrate that. He'd said he

didn't have any evidence to demonstrate that other than his word.
Again, the burden is on the Government here to establish that
this Motion to Suppress should be overruled. Well, I don't think
he had probable cause or reasonable suspicion to make a stop,
period. I don't think there's been evidence here to show the
Court that there's reasonable suspicion or probable cause to make
a stop. Even if the Court decides and determines that there is,
then we get into a *Rodriguez* issue. Because what we have to
decide there is whether the officer can effectuate the purpose of
the stop expeditiously or whether it was completed in a
reasonable period of time. And again, when we talk about the
knowledge that he had from Detective Copley, again, they weren't
specific on what Detective Copley told him. So, we don't know if
Detective Copley added to it, but it doesn't matter. We have to
know -- we know what Detective Copley knew at that time, and it
wasn't much. It certainly wasn't anything regarding Felix
Forjan. So, the purpose of this stop, as you heard from Deputy
Hook, was an expired license plate tag at worst. I don't think
that they established that, but an expired license plate is what
he said. There's not even a picture of the license plate to show
it's expired. The Court doesn't have the evidence to reach a
conclusion that it was expired. But according to Hook, that was
the purpose of the stop. So, when we think about it in those
terms, again, we get back to *Rodriguez*. I know the Government
wants to separate this case from *Rodriguez*, but you really can't.

The court in *Rodriguez*, the U.S. Supreme Court states that

"Addressing the infraction is the purpose of the stop. It may

last no longer than is necessary to effectuate that purpose."

So, when we're looking at the purpose of the stop and even the

information that he got after that, the expired driver's license

and the no insurance, he got up there and sort of pridefully

said, it took him 12 minutes to write a citation for no

insurance. Come on? That's not reasonable. And the *Rodriguez*

court said that if an officer could complete his tasks

expeditiously, that's how long it should take. They didn't set a

time limit. Obviously, in that -- in *Rodriguez*, it was eight

minutes to complete the traffic -- the traffic -- the purpose of

the traffic stop. The entire investigation, not just writing one

ticket. Twelve minutes. When he sits in his car seat, he has

the information already pulled up, and it takes him 12 minutes to

fill out those blanks. That is unreasonable. That is not

reasonable. On December 20th at 7:00 p.m., 7:30 p.m., Felix

Forjan is sitting on the bumper of his truck outside waiting for

that officer to finish writing these tickets. He's sitting

there. It's December 20th. No doubt it's cold out. The sun's

down. He's sitting outside waiting for this officer, and he

takes 12 minutes to write a ticket. That's not reasonable. And

the Supreme Court has dictated that, that the time they take to

write those tickets has to be reasonable. And he easily could

have had those three tickets written in 12 minutes, all three of

them. That would have been reasonable. But instead, he's clearly prolonging this to wait for the drug dog to come. And keep in mind, all we're talking about is 12 minutes from the time that he called for the drug dog to the time that the drug dog got there. We don't know, you heard no evidence regarding when the dog actually hit on the cigarette pack. So, we don't know when additional reasonable suspicion came about. You didn't hear that. All you heard was 12 minutes from the time it was called to the time the dog got there. So, as the dog's there circling the truck, it's prolonged even more. We don't know how long. Again, the burden is on the Government, but it's longer than 12 minutes. So, he's sitting there for a minimum of 25 minutes, longer than that, because again, the drug dog didn't go immediately to that cigarette pack. It sniffed around the truck for who knows how long. So, we're talking a minimum of 25 minutes to investigate an expired license plate, an expired driver's license and no insurance. The Government wanted to talk about the inevitable discovery. Well, you heard him on cross say, well, if there was a family member that could have picked up the truck, I may have let him do that. He didn't say without a doubt we were going to tow that truck. He said I wasn't going to let him drive from that scene. He said up on direct, we probably were going to have to tow it. But then on cross he said, well, I don't want to bother people too much. If there was a family member, I might have. A lot of times I let the family member

just drive the truck.  So, there's no inevitable discovery here.
They didn't establish that this was inevitable discovery, and the
burden is on the Government.  So, there's no inevitable
discovery.  And I'll brief the issues regarding standing.  And
I'll brief the other issues concerning whether what Detective
Copley observed at the house was enough to prolong the stop,
which is what was done.  It was prolonged for the purpose of
getting the drug dog there.  It was prolonged for the purpose of
investigating whether there was narcotics in this vehicle, and
there was not reasonable suspicion to do so.  That's what we're
here to decide.  And based on the evidence that the Court has
before it, this is one of those rare cases where the Government
hasn't done it.  So, I'd ask the Court to sustain our Motion to
Suppress, and I'll be happy to brief those other issues.

THE COURT:  All right.  Thank you, Mr. Woody.  Well, I
will give the parties both -- it's not -- I'm just going to give
you -- I would like to have briefing from both parties on the
issue of standing because it has not been addressed.  And then
also I think you both have heard the Court want briefing on the
issue of the activity at the house and the testimony related to
that by, I believe it was Officer Copley, whether that was enough
to justify an investigatory detention or stop the vehicle.  I
can't believe that there aren't cases where there have been --
where there has been surveillance at a house with lots of
activity, where there is believed to be drug activity, where

there aren't vehicles that are stopped leaving those residences. Now, I know from my own experience, usually there is an independent basis for the stop of the vehicle separate from what was observed at the house. But I think that needs to be addressed. As I've indicated, I don't find the *Rowe* case to be dispositive, and that deals with that there was probable cause to stop and search the vehicle under the automobile exception. I don't think it rises anywhere near that. But I do think the issue of reasonable suspicion needs to be fleshed out more by both parties. I will give the parties -- is 30 days enough time for you to brief those two issues? Again, this is not going to be Government responds and then there's a response by defense counsel. I'm going to give the parties 30 days to brief the issue of standing and to brief the issue of whether investigatory detention was warranted based on the testimony of Officer Copley, independent of the probable cause that was testified to of a traffic stop.

MR. WOODY: Your Honor, I apologize. Would the Court consider 45? I have a jury trial February 20th, and then I'm going out of town the end of February.

MR. McGULL: I guess that would give us enough time, Your Honor. Excuse me, Your Honor. Give us enough time to get the transcript, so we can be very accurate in our responses to the Court.

THE COURT: Well, I mean, you'll have the transcript

1  probably within a couple of days.

2       MR. McGULL:  Oh.

3       THE COURT:  But if you're, I mean, it's 15 more days.  I

4  just hate to prolong.  We've continued this detention hearing

5  multiple times at the request of counsel for a variety of

6  reasons.  It's, I mean --

7       MR. WOODY:  On March the 6th -- I mean, I'm gone March

8  6th.  I'm out of town on vacation from March 2nd to March 7th.

9       THE COURT:  Yeah, this case has had a long history

10  already.  We've continued, I think at your request Mr. Woody, a

11  couple of times maybe, at least once.  And well, I'll give you 45

12  days, but if you can get it done before then, I think you should

13  do everything you can because the Court will not, you know, move

14  forward with, you know, drafting the Report and Recommendation

15  until it's been fully briefed.  So, at the defendant's request --

16  any objection, Mr. McGull, to the 45 days?

17       MR. McGULL:  No, Your Honor.

18       THE COURT:  All right.  At defendant's request, the

19  record should reflect the defendant has requested 45 days to

20  submit briefing on the issues highlighted by the Court.  Both

21  sides will be given 45 days.  And again, this is to file your

22  briefing on those issues.  It is not -- I don't expect a reply to

23  the Government's motion or the Government's briefing.  This will

24  just be your response to those two areas that I've identified.

25  Anything further from either side?

1      MR. McGULL:  No, Your Honor.

2      MR. WOODY:  No, Your Honor.

3      THE COURT:  All right.  Thank you.  With that, we'll be

4  in recess.

5                  (Court Adjourned at 11:19 a.m.)

**INDEX**

| WITNESSES FOR THE PLAINTIFF: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Jason Copley | 3 | 14 | 25 | 28 |
| Jeffrey Hook | 29 | 52 | | |

| EXHIBITS: | MARKED | ADMITTED |
|---|---|---|
| G#1 | 9 | 10 |
| G#2 | 10 | 11 |
| G#3 | 43 | 44 |
| G#4 | 44 | 45 |
| G#5 | 46 | 46 |

            I certify that the foregoing is a correct transcript
from the electronic sound recording of the proceeding in the
above-entitled matter.


            /s/ Lissa C. Whittaker          February 12, 2018
            Signature of transcriber               Date