# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 17-3011-01-CR-S-RK ) |
| FELIX FRANZ FORJAN, | ) ) |
| Defendant. | ) |

## **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. Defendant Felix Franz Forjan filed a Motion to Suppress Evidence (Doc. 27) alleging that the stop, detention, and search of the vehicle he was driving was improper in that: (1) the officer lacked enough information to provide probable cause to stop his vehicle; and (2) the stop was unreasonably prolonged to allow for the arrival of a drug dog. As such, Defendant contends that all evidence obtained as a result of the stop must be suppressed as fruit of the poisonous tree. On February 6, 2018, the undersigned held a hearing on this matter. Defendant was present with his attorney Adam Woody. The Government was represented by Assistant United States Attorney Abram McGull II. During the hearing, the Court heard testimony from Jason Copley, an officer with the Springfield, Missouri Police Department, and Jeffery Hook, a patrol deputy with the Christian County Sheriff's Office. For the following reasons, the undersigned **RECOMMENDS** that Defendant's Motion be **DENIED**.

## I. Findings of Fact[1]

On December 20, 2016, Springfield Police Department Officer Jason Copley was conducting surveillance of a house at 569 Farrow Road in Nixa, Missouri ("the Nixa house"). The person residing at the Nixa house had previously been observed through surveillance arriving at the location of a known methamphetamine dealer in Springfield, Missouri. A confidential informant ("CI") later corroborated that the Nixa house resident was supplying the dealer in Springfield with pound level methamphetamine. The CI was reliable and had provided information to the Springfield Police in the past. This information lead to the surveillance of the Nixa house.

Officer Copley had been surveilling the Nixa house for about six months, during which he had personally observed it five to ten times. Prior to December 20, 2016, he observed high volumes of traffic during certain periods, an indicator of narcotics distribution. He also observed two targets from different drug cases there on different occasions. He also attempted to follow other vehicles in previous surveillance sessions, but he never successfully executed a traffic stop due to a lack of officers on patrol at the time.

On December 20, 2016, Officer Copley observed multiple vehicles arrive at and leave the Nixa house. Earlier that afternoon, he had contacted Jeffery Hook, a Deputy with the Christian County Sheriff's Office, via cell phone and informed him of their surveillance in the area. Around 4 p.m., Officer Copley attempted to follow one of the vehicles as it left the residence, but the vehicle got away. Upon returning to the residence, he observed a motorcycle and a white Ford

---

[1] The facts set forth herein are taken from the testimony adduced at the hearing on the instant Motion and the exhibits admitted during the hearing. The hearing transcript appears as Doc. 39, and the Government's exhibit list appears as Doc 38.

flatbed pickup truck ("the truck") at the house. The lights on the truck were left on, indicating to Officer Copley it did not intend to stay long.

After 45 minutes to an hour, the truck left the residence. Officer Copley called Deputy Hook and informed him the truck was leaving and gave him a description of it. Officer Copley asked Deputy Hook to conduct a traffic stop but to keep it random as not to incite the driver's suspicion. Officer Copley followed the truck for about a half-mile to a mile before Deputy Hook made contact with it. Deputy Hook was driving in the opposite direction of the truck, passed it at an intersection, and then turned around to follow it. Deputy Hook noticed that the license plate on the front of the truck had what he believed was an expired tag.

At 6:41 p.m., Deputy Hook initiated a traffic stop on the truck. He asked the driver for his driver license. The driver, subsequently identified as Felix Forjan, the Defendant, explained to Deputy Hook that he did not have a license. Defendant also told Deputy Hook that the truck was not his, but that it was his daughter's work truck. Deputy Hook and Defendant also had a lengthy, friendly conversation lasting about three to five minutes about Defendant's immigration status and service in the Army before Deputy Hook returned to his patrol car to run Defendant's name, date of birth, and Social Security number to positively identify him. After positively identifying him as Defendant, Deputy Hook returned to the truck, engaged in another short conversation, and then started to investigate further.

Deputy Hook asked Defendant for proof of insurance. Defendant went to the passenger side and produced an expired insurance card from the glove box. Deputy Hook then went back to his patrol car to run checks on Defendant. Deputy Hook radioed dispatch for warrants, Defendant's driving record, and driving history. Deputy Hook testified that these checks can take

3

anywhere from 15 seconds to 10 minutes, but he believed that they took about 3-4 minutes in this instance. The checks revealed that Defendant's license had been expired since 2011.

Upon learning this, Deputy Hook went back to the truck and asked Defendant for consent to search the truck. Defendant refused this request, stating that it was his daughter's work truck, and he did not feel comfortable allowing it to be searched. After this, Deputy Hook asked Defendant to step out of the truck and wait at the back while Deputy Hook wrote the citations. Defendant exited the truck and Deputy Hook patted him down for weapons but found none. During the pat-down, Defendant voluntarily removed a pack of cigarettes and a cell phone from his pockets and placed them on the bed of the truck.

Deputy Hook then returned to his patrol vehicle, made a request for a K-9 unit at 6:54 p.m., and began handwriting the citations. At 7:06 p.m., Officer Wilson of the Ozark, Missouri Police Department and his dog, Bump, arrived. At this point, Deputy Hook had finished writing one of the three citations that he intended to give Defendant. Deputy Hook testified that it took longer than normal to write the tickets because he did not possess sufficient information about the truck and Defendant. Deputy Hook also testified that sometimes it takes longer for dispatch to relay the needed information, and dispatch is usually busy around this time of the evening. Deputy Hook testified that it took dispatch 2-4 minutes to respond to his inquiries.

Upon arrival, Officer Wilson took Bump to do an exterior sniff of the vehicle. He then informed Deputy Hook that the dog "indicated" for possible narcotics on the cigarette pack on the truck bed. Deputy Hook asked Defendant why the narcotics dog would have "indicated" on his cigarette pack. Defendant told Deputy Hook that he smoked marijuana, and that some leftover marijuana cigarettes, or roaches, may be left on the floorboard. Defendant also explained his

4

cigarette pack is where he keeps his marijuana cigarettes and that he had smoked one earlier that morning.

Based on this statement from Defendant and the positive hit by the drug dog, Deputy Hook testified that he believed he had probable cause to search the truck for possible narcotics. He began searching the truck, and in the back seat observed a laundry basket full of clothes as well as other clothes strewn about as if someone was living there. After taking the clothes off the top of the basket, Deputy Hook discovered six bundles wrapped in electrical tape. He cut open one of the bundles with his knife, and found a Ziploc bag full of a crystal-like substance. After using a field-test kit on it, he determined it to be methamphetamine.

Deputy Hook then asked Officer Wilson to put Defendant in hand restraints, read Defendant his *Miranda* rights, and then placed him in the patrol vehicle for the remainder of the stop. At the conclusion of the police stop, the truck was released to St. John's Towing to be removed from the intersection.

## II. Conclusions of Law

Defendant contends that the information provided from the confidential informant regarding the Nixa house, combined with the fact that Defendant left the house, did not provide probable cause for law enforcement to stop and search his vehicle. Defendant also argues the stop was unreasonably prolonged because the officer detaining him delayed the issuance of tickets to allow for a drug dog to arrive on the scene.

### A. Standing to Challenge Search

The Court will first address whether the Defendant has standing to challenge the search of the truck. The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be

violated…." U.S. Const. amend. IV. The Supreme Court has determined two inquiries for Fourth Amendment analysis. The first inquiry is to "ask whether the individual, by his conduct, has exhibited an actual expectation of privacy-that is, whether he has shown that 'he sought to preserve something as private.'" *Bond v. United States*, 529 U.S. 334, 338 (2000). The second inquiry is "whether the individual's expectation of privacy is one that society is prepared to recognize as reasonable." *Id.* The first inquiry is subjective to the defendant; the second is an objective inquiry.

"Fourth Amendment rights are personal and cannot be asserted vicariously." *United States v. Pierson*, 219 F.3d 803, 806 (8th Cir. 2000). "A defendant who 'fails to prove a sufficiently close connection to the relevant places or objects searched…has no standing to claim that they were searched or seized illegally.'" *Id*. (quoting *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994). "A defendant moving to suppress evidence has the burden of showing a legitimate expectation of privacy in the area searched." *Pierson*, 219 F.3d at 806. A defendant "must present at least some evidence of consent or permission from the lawful owner/renter to give rise to an objectively reasonable expectation of privacy." *United States v. Muhammad*, 58 F.3d 353, 355 (8th Cir. 1995). "The driver must make an 'affirmative showing of consensual possession to satisfy the standing requirements.'" *United States v. Long*, 870 F.3d 792, 796 (8th Cir. 2017) (quoting *Muhammad*, 58 F.3d at 355).

Here, Defendant did not claim ownership of the truck. He stated to Deputy Hook that the truck belonged to his daughter and was her work vehicle. The truck did not have registration papers or up to date insurance. Defendant also had an expired operator's license. Defendant could provide no reference from his daughter to show that he had her permission to drive the white truck.

Defendant has failed to "make an affirmative showing of consensual possession." *See Long*, 870 F.3d at 796; *Muhammad*, 58 F.3d at 355. Defendant provided no evidence or testimony

6

at the suppression hearing that he had permission from his daughter or the company to drive the vehicle. Defendant provided no reference to Deputy Hook that his daughter gave him permission to drive it. Defendant only briefly mentioned that it was his daughter's work vehicle and that he was not comfortable with it being searched. Therefore, since the Defendant failed to provide any evidence of consent or permission from the lawful owner, Defendant does not have a legitimate expectation of privacy in it, and the Court finds that the Defendant does not have standing to challenge the search of the truck. Accordingly, on this basis, the motion to suppress should be denied.

B. **Probable Cause to Stop Vehicle**

In the event Defendant does have standing to challenge the search, the Court must determine if there was probable cause to stop the vehicle.

"A traffic violation, however, minor, provides probable cause sufficient to satisfy the constitutional reasonableness requirement." *United States v. Frasher*, 632 F.3d 450, 453 (8th Cir. 2011). "Once an officer has probable cause, the stop is objectively reasonable and any ulterior motivation on the officer's part is irrelevant." *Id.* (citing *United States v. Arciniega*, 569 F.3d 394, 397 (8th Cir. 2009)). The traffic stop can be a pretext for another investigation. *United States v. Payne*, 534 F.3d 948, 951 (8th Cir. 2008). "It is irrelevant that the officer would have ignored the violation but for his ulterior motive." *Frasher*, 632 F.3d at 453.

Deputy Hook testified he believed there was probable cause for a traffic stop based on his observation that the truck had a tag stating "December '16." The traffic stop occurred on December 20, 2016, however, and under Missouri law, a person has until the end of the month shown on their tags to renew their registration. MO. REV. STAT. § 301.030(1) (2007). Deputy Hook stated that he believed the tag was expired because it was the middle of the month shown on

7

the tag. Since the law of Missouri states that tags do not expire until the end of the month stated on the tag, Deputy Hook was mistaken as to the law on which he based his probable cause.

Consequently, the Court must decide if probable cause can be based upon a mistake of law. The Supreme Court decided this very issue in *Heien v. North Carolina*. In that case, the Supreme Court stated "[t]his holding—that reasonable mistakes of law, like those of fact, would justify certificates of probable cause—was reiterated in a number of 19th-Century decisions." *Heien v. North Carolina*, 135 S. Ct. 530, 537 (2014). In the Eighth Circuit, the distinction between a mistake of law and a mistake of fact is irrelevant to the inquiry. *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). "The validity of the stop depends on whether the officer's actions were reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." *Id.* "The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* (citing *United States v. Sanders*, 196 F.3d 910, 913 (8th Cir. 1999)).

The Court finds Deputy Hook to be credible and concludes that Deputy Hook's mistake of law was a reasonable one. In his testimony, Deputy Hook stated that he always attempts to find probable cause for a stop. He stated that he believed the tag was expired since it was the middle of the month. He remained consistent throughout the hearing, did not waver or change his explanation, and apparently believed the law required tags to be renewed by the middle of the month. He even stated that he was going to research the violation at issue, because he was not sure he could issue an expired registration citation to a driver who did not own the vehicle. After engaging the truck, Deputy Hook learned of two additional, valid traffic violations: expired insurance and driving without a valid license. These violations gave Deputy Hook a basis for

8

continuing the traffic enforcement. Therefore, the Court concludes that Deputy Hook's mistake of law for pulling the truck over was reasonable, and probable cause did exist for the stop.

    **C.    Reasonable Suspicion to Stop Vehicle**

The Government argues in the alternative that the police possessed reasonable suspicion to stop the truck based upon their observations at the Nixa house.

"A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Collins*, 883 F.3d 1029, 1031-32 (8th Cir. 2017) (quoting *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016)). The test for whether an officer has a "particularized and objective basis to suspect wrongdoing" is the totality of the circumstances. *Collins*, 883 F.3d at 1032 (citing *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012)). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provide 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *Collins*, 883 F.3d at 1032 (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *Collins*, 883 F.3d at 1032 (quoting *United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016)).

A tip from a confidential informant can provide a basis for reasonable suspicion. *Adams v. Williams*, 407 U.S. 143, 146-47 (1972). The informant must possess information that carries "enough indicia of reliability to justify the officer's forcible stop." *Id.*

In the present case, Officer Copley was relying upon information from a CI regarding the Nixa house. The CI provided information that the person living in the Nixa house was providing

9

pound level methamphetamine to a dealer in Springfield. The informant could not provide names, descriptions, vehicles, or schedules of the drug transactions. The CI provided no information about Defendant or the truck he was driving.

Officer Copley had personally observed the Nixa house on five to ten occasions, and the surveillance had been going on for six months. Prior to Defendant's stop, no vehicles had been pulled over leaving the house, nor had the house ever been searched or a warrant issued for the search of it.

The *Collins* case is instructive in this matter. In *Collins*, police officers were observing a house that was known for drug activity; an undercover drug enforcement officer had previously made two controlled buys from the resident of the house in the garage. *Collins*, 883 F.3d at 1030. Surveillance had been going on for about a month, and multiple times officers had observed heavy vehicle, bicycle, and foot traffic in and out of the garage in the late evening and early morning hours; the officers also knew that the resident drove a white motorcycle. *Id*. Officers observed a vehicle pull up to the house about 4:30 a.m., enter the garage, and return to the vehicle about ten minutes later; the officers also noticed the motorcycle was present at the time. *Id*. Officers decided to follow the vehicle away from the house. *Id*. Officers then conducted a traffic stop on the driver after it was out of sight of the garage. *Id*. A loaded firearm was found in the vehicle after an officer observed a magazine and ammunition in plain view and conducted a protective sweep of the vehicle; the driver was a convicted felon. *Id*.

The 8th Circuit in *Collins* held that the officers had reasonable suspicion that criminal activity was afoot. *Id*. at 1033. The Court stated that the officers observed the driver enter a garage known for drug sales very early in the morning. *Id*. The Court also pointed to the fact that the officers had personally observed multiple nights of heavy vehicular, bicycle, and foot traffic. *Id*.

The Court also noted the presence of the distributor's motorcycle at the house, indicating to the officer that the dealer was home and likely selling that night. *Id*. The Court stated that given the totality of the circumstances the officers had reasonable suspicion that the driver was engaged in criminal activity. *Id*.

In contrast, in the present case, the Court finds that no reasonable suspicion existed to stop Defendant based upon Officer Copley's observation of the truck leaving the Nixa house. Officer Copley had no evidence that drug transactions occurred at the Nixa house, and the truck driven by Defendant remained at the Nixa house for forty-five minutes to an hour, much longer than a typical drug transaction. Also, there is no indication of how long Defendant was at the house personally, as Officer Copley did not actually see who arrived in the truck. Thus, the truck could have been driven by another person to the Nixa house, and then driven away by Defendant. It is entirely reasonable that Defendant could have been in the house a longer amount of time. Unlike other cases of vehicles leaving known drug houses and areas, the Nixa house had never been searched, no cars had ever been stopped, and no transactions had ever been observed. *See United States v. Stringer*, 739 F.3d 391, 395 (8th Cir. 2014) (stating that a police officer's observation of a vehicle leaving a house known for drug transaction that had been searched several times by drug task force and the officer's past history of pulling people over for drugs in the area equated to reasonable suspicion of drug activity given the totality of the circumstances).

Therefore, the Court concludes that no reasonable, articulable suspicion existed to stop the truck based upon it leaving the Nixa house, Officer Copley's observations, and the CI information; however, as discussed previously, probable cause did exist to stop the truck for the traffic violation.

### D. Impermissible Prolonging of the Encounter

Having determined that there was probable cause for the traffic stop, the Court must now address the question of whether the stop was unreasonably prolonged to allow for the arrival of a drug dog.

"The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2014). "Because addressing the infraction is the purpose of the stop, it may 'last no longer than is necessary to effectuate th[at] purpose.' Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonable should have been—completed." *Id.* (citations omitted). "The seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 1615 (citations omitted). "An officer, in other words, may conduct certain unrelated checks during an otherwise lawful traffic stop." *Id.* However, "[the officer] may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.*

"Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Id.* (citing *Caballes v. United States*, 543 U.S. 405, 408 (2005)). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez,* 135 S. Ct. at 1615. "A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (citing *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000). "Lacking the same close connection to

roadway safety…, a dog sniff is not fairly characterized as part of the officer's traffic mission." *Rodriguez*, 135 S. Ct. at 1615.

However, "the use of a well-trained narcotics-detection dog—one that 'does not expose noncontraband items that otherwise would remain hidden from public view,'—during a lawful traffic stop, generally does not implicate legitimate privacy interest." *Caballes*, 543 U.S. at 409. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." *Id*. "The officer did not need to have probable cause or even reasonable suspicion to support this [dog sniff] scan because 'a dog sniff of the exterior of a vehicle is not a search.'" *United States v. Gregory*, 302 F.3d 805, 810 (8th Cir. 2002) (quoting *United States v. Morgan*, 270 F.3d 625, 629 (8th Cir. 2001)).

"The legally significant time calculation begins at the time the purpose of the stop was completed." *United States v. Englehart*, 811 F.3d 1034, 1041 (8th Cir. 2016). In *United States v. Peralez,* the Eighth Circuit stated that a traffic stop was unreasonably prolonged when "nothing unusual occurred during the traffic stop" and "there was nothing unusual or out of place with the [vehicle's] registration or the driver's documents" that would justify extending the traffic stop. *United States v. Peralez*, 526 F.3d 1115, 1120 (8th Cir. 2008).

In the present case, Deputy Hook first stopped Defendant at 6:41 p.m.; after an initial conversation lasting roughly four to five minutes, Deputy Hook began to conduct the traffic stop as he normally would. Several facts contributed to the stop taking longer than usual. First, Defendant had no driver's license. Second, the vehicle he was driving did not have any registration or insurance. Third, Defendant was stopped at a busy time of day. Fourth, the stop occurred during a busy time of year, just five days before Christmas.

13

Deputy Hook engaged Defendant again and asked for consent to search the vehicle; Defendant refused, stating that he was not comfortable with the vehicle being searched because it was his daughter's work vehicle. Deputy Hook then asked Defendant to step out of the vehicle, which he did. Deputy Hook then patted down Defendant for weapons, at which time Defendant voluntarily removed a pack of cigarettes and a cell phone and laid them on the bed of the truck.

Although the issue was not raised by either party, the Court will address the pat-down of Defendant. An officer may perform a protective pat-down if the officer has a "reasonable suspicion that [an individual] may be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998); *United States v. Oliver*, 550 F.3d 734, 737 (8th Cir. 2008). The officer does not have to know the individual is armed, but rather must show that a "reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Oliver*, 550 F.3d at 738. Here, Deputy Hook was justified in patting down the Defendant. Deputy Hook knew from Officer Copley that the Defendant was leaving a house being surveilled for drug activity; the 8th Circuit has repeatedly held that it is reasonable for an officer to pat-down an individual suspected of being involved in a drug trade. *United States v. Bustos-Torres*, 396 F.3d 935, 943 (8th Cir. 2005); *United States v. Robinson*, 119 F.3d 663, 667 (8th Cir. 1997) (holding that weapons and violence are frequently associated with drug transactions). In addition, the stop occurred after dark on December 20, Deputy Hook was conducting the stop alone, and he could not continually watch the Defendant while he was writing the citations. *United States v. Preston*, 685 F.3d 685, 689-90 (8th Cir. 2012) (stating the fact a traffic stop occurs at night goes to the officer's safety). Therefore, the Court finds that the pat-down of the Defendant was reasonable given the totality of the circumstances.

Deputy Hook then returned to his patrol car at 6:54 and called for a drug dog, and at 6:56, an officer responded that he was bringing his drug dog. He then began writing one of the three tickets he anticipated having to write. At 7:06, the drug dog arrived; Deputy Hook had just concluded writing one of the tickets. Deputy Hook testified that it took longer to write the tickets than anticipated due to not having adequate information from Defendant. Deputy Hook also testified that he had to wait 2-4 minutes for dispatch to respond to his inquiries that night. As the drug dog walked around the vehicle, the dog "indicated" to the cigarettes that Defendant had voluntarily placed on the flatbed of the truck. After being asked why the dog would get a hit off of the cigarettes, Defendant told Deputy Hook that he smoked marijuana, he had smoked marijuana cigarette earlier that day, and there might be some leftover marijuana cigarettes, or roaches, on the floorboard.

A total of twelve minutes passed between the call for the drug dog and the dog's arrival on the scene. It is reasonable that the writing of one ticket would take twelve minutes. Unlike *Peralez*, where no problems existed with any of the driver's information, vehicle registration, or insurance to justify a longer stop, Deputy Hook faced a myriad of issues preventing him from having requisite information to complete the citations. *Peralez*, 526 F.3d at 1120. Since Defendant did not possess registration, insurance, or a driver license, Deputy Hook had to rely upon dispatch for information necessary for the citations, and this would cause the stop to take longer than normal. Defendant argues that a twenty-five minute traffic stop is unreasonably long; however, in *Rodriguez*, the traffic stop took twenty-one to twenty-two minutes before the officer issued a warning. *Rodriguez*, 135 S. Ct. at 1612-13. The Supreme Court in that case noted nothing unreasonable about the length of the valid traffic stop. Therefore, the Court finds that twelve

minutes to write one ticket and twenty-five minutes in total for the stop were not unreasonable under the circumstances.

Defendant relies heavily upon *Rodriguez*. The Court finds that these two cases are distinguishable. Unlike *Rodriguez*, here, the drug dog arrived on the scene while the traffic stop was still in progress. Deputy Hook still had at least one more ticket that he was planning to write, and he was going to research another possible violation. In *Rodriguez*, the driver was detained for eight minutes after the issuance of a written warning, which concluded the purpose of the stop. *See Id.* at 1616. Therefore, since the drug dog arrived at the scene during the course of the traffic stop, the Court distinguishes between *Rodriguez* and the present case.

There is nothing in the record to indicate that Deputy Hook purposefully or intentionally delayed in writing the tickets to allow for the drug dog to arrive. Therefore, since the drug dog arrived and walked around the vehicle during a lawful traffic stop, the Court finds that the stop was not unreasonably prolonged.

### E. Probable Cause to Search the Vehicle

Having determined the traffic stop was not unreasonably prolonged, the Court must determine if there was probable cause to search the vehicle.

"A dog sniff is not a search within the meaning of the Fourth Amendment, and thus requires no probable cause to be performed." *United States v. Sanchez*, 417 F.3d 971, 976 (8th Cir. 2005) (citing *Caballes*, 543 U.S. at 405). "A dog's positive indication alone is enough to establish probable cause for the presence of a controlled substance if the dog is reliable." *United States v. Olivera-Mendez*, 484 F.3d 505, 512 (8th Cir. 2007). Admission of drugs in a vehicle or drug use provides probable cause to search the vehicle for drugs. *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012). "Once probable cause is established, the vehicle can be searched without a

16

warrant under the automobile exception to the warrant requirement." *Sanchez*, 417 F.3d at 976. "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Olivera-Mendez*, 484 F.3d at 512 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).

The Court finds that probable cause to search the vehicle did exist based upon the dog sniff and Defendant's admission that there were possible narcotics in the vehicle. A dog's positive indication that drugs are present is enough for probable cause. *Olivera-Mendez*, 484 F.3d at 512. Here, the drug dog alerted on Defendant and his cigarette pack that was laying on the bed of the truck. Upon this positive identification, Deputy Hook asked Defendant why the dog would alert on his cigarette pack, and Defendant responded that he smoked marijuana and that there might be a few leftover marijuana cigarettes left in the floorboard. The positive indication by the drug dog, followed by the statement made by Defendant that possible narcotics were in the vehicle, gave Deputy Hook probable cause to search the truck.

Once the probable cause existed, Deputy Hook was allowed to search the vehicle without a warrant under the automobile exception. *Sanchez*, 417 F.3d at 976. He also was allowed to search every part of the truck, even though no marijuana or roaches were found in the floorboard before Deputy Hook moved to the back of the vehicle where the methamphetamine was found. *Olivera-Mendez*, 484 F.3d at 512. He was also justified in searching the laundry basket. *See Ross*, 456 U.S. at 818, 825. Therefore, the Court finds that probable cause existed to search the vehicle based upon the dog sniff and admission from Defendant that he smoked marijuana.

## III. Recommendation

Based on the foregoing discussion, the undersigned hereby **RECOMMENDS** that Defendant's Motion to Suppress Evidence (Doc. 27) be **DENIED**.

*/s/ David P. Rush*  
DAVID P. RUSH  
UNITED STATES MAGISTRATE JUDGE

DATE: July 16, 2018